# WIND ROCK COAL & COKE COMPANY v. JAMES G. ROBBINS.

Eastern Section. February 13, 1926.

Certiorari denied by Supreme Court June 15, 1926.

**1. Judgments. Duty of clerk to enter judgment as matter of course.**

Under Shannon's Code, section 5892, it is the duty of the clerk of the circuit court as soon as verdicts are rendered to enter judgments thereon as a matter of course, and he needs no authority from the court, either in the form of a written order or judgment signed by the court or O.K.'ed by counsel, or otherwise.

**2. Judgments. Judgment nunc pro tunc entered when.**

The lapse of time between the announcement of judgment and the making of a motion for judgment nunc pro tunc is of no importance; that which is important is, that the proof be clear and convincing that the judgment which it is sought to have entered is the one pronounced in the cause.

**3. Judgment. Evidence held sufficient to justify judge in entering judgment nunc pro tunc.**

Where judge had minute entries of his own court showing the verdict of the jury, the filing and overruling of the motion for a new trial, and an appeal prayed and granted, and he had an appeal bond executed by the defendant which recited that judgment had been rendered, and a bill of exceptions signed by a former judge which recited judgment had been rendered, held proper to enter judgment nunc pro tunc.

**4. Master and servant. Master owes servant no duty to warn him where danger is known to servant.**

In an action to recover damages for injuries received in mine, held where servant has knowledge of danger incident to his work there is no duty on the master to warn him of the danger.

**5. Appeal and error. Evidence of contributory negligence of plaintiff a miner, held to justify directed verdict for defendant.**

In an action by a miner to recover damages for personal injuries caused by hitting his head against roof of mine while riding on mine cars where evidence showed plaintiff had worked in mine for years and in this particular mine for a long time and was familiar with the condition of the roof of the mine and knew its dangers, held he assumed the risk of the injury and verdict should have been directed for defendant.

Appeal in Error from Circuit Court, Anderson County; Hon. J. H. S. Morison, Judge.

Reversed.

James B. Wright, of Knoxville, and Jas. H. Underwood, of Clinton, for Wind Rock Coal & Coke Co.

John M. Davis, of Wartburg, Chas. H. Davis, of Oneida, D. W. Byrge, of Oakdale, and J. B. Burnett, of Clinton, for James G. Robbins.

THOMPSON, J. The parties will be spoken of as in the court below.

The plaintiff recovered a judgment against defendant for $5,-000, damages, on account of personal injuries received by him while working in the defendant's coal mine. The defendant has appealed and has assigned errors. A preliminary question arises on the entry of the judgment nunc-pro-tunc, as follows:

The case was tried in the circuit court before Judge Morison and a jury at the May, 1923 term. At the conclusion of plaintiff's testimony the defendant moved the court to direct the jury to return a verdict in its favor. The court overruled this motion and the defendant not introducing any evidence in its behalf, the court submitted the case to the jury, who returned a verdict in favor of the plaintiff for $5,000.

The verdict was entered on the minutes of the court but by oversight no judgment was entered. The minute entry containing the verdict was under date of May 24, 1923, and was as follows:

"This day came the parties by their attorneys; also came the following jury of good and lawful men, to-wit: Chas. Miller, W. L. Roberts, J. H. Crawford, R. C. Williams, L. W. Webber, Steve Yerkes, Jake Portwood, G. E. Johnson, T. J. Kidwell, Geo. Radford, J. E. Weaver and J. A. Hobbs.

"Who were duly elected, empannelled and sworn to try the issues joined between the parties.

"All the evidence being heard, the defendant moved the court to instruct the jury to return a verdict in its favor. And the court having considered said motion is pleased to and does overrule the same.

"And said jury having heard argument of Counsel, received the charge of the court, who upon their oaths say they find the issues in favor of the plaintiff, and fix the amount of his recovery at five thousand ($5,000) dollars.

"Thereupon comes the defendant and moves the court to show cause why a new trial should be granted it in this cause."

Also under date of May 24, 1923, the defendant's motion for a new trial was spread upon the minutes.

Under date of July 19, 1923, an order was entered upon the minutes overruling defendant's motion for a new trial and allowing the defendant to appeal, and allowing additional time for the filing of a bill of exceptions. This order or minute entry is as follows:

"This cause came on to be heard on this the 19th day of July, 1923, before the Hon. J. H. S. Morison, Circuit Judge, etc., upon the motion for a new trial heretofore filed on May 24, 1923, by the defendant, Wind Rock Coal & Coke Co., and upon consideration of

said motion, the court is pleased to and doth overrule same, to which action, the defendant excepted and now excepts from the action of the court in overruling the motion for a new trial. The defendant prayed an appeal to the next term of the court of civil appeals, at Knoxville, and having given bond as security for the costs; the said appeal is granted and defendant is given thirty days within which to prepare and file its bill of exceptions. It is so ordered and decreed.''

On July 19, 1923, the defendant filed an appeal bond conditioned that it should: ''successfully prosecute an appeal in the nature of a writ of error to the next term of the court of civil appeals of Tennessee, at Knoxville, by it prayed from a judgment rendered against it in favor of the said James G. Robbins, in the circuit court of Anderson county, on the 19th day of July, 1923, for the sum of five thousand dollars,'' etc.

On August 16, 1923, the defendant filed a bill of exceptions reciting, among other things, that a judgment had been rendered in favor of plaintiff and against defendant for $5,000.

On July 19, 1924, the court of civil appeals filed an opinion holding that because the judgment had not been entered in the circuit court, the appeal was premature. That court also said in its opinion: ''Moreover, it does not appear from the transcript in the present case that the bill of exceptions was filed in the court below.'' The opinion ended as follows: ''An order will be entered dismissing the appeal and remanding the case to the circuit court of Anderson county. The defendant Wind Rock Coal & Coke Co., having attempted to bring up the cause, will pay the costs of the transcript and the costs accrued in the court, as provided in Shannon's Code, section 4957.''

The material portion of the order or decree which was entered in the court of civil appeals on the same day the opinion was filed, i. e. July 19, 1924, was as follows:

''From all of which it appearing to the court for the reasons stated in its opinion filed herein and made a part of the record in this case that the bill of exceptions was not filed in the court below;

''It is therefore ordered and adjudged by the court that the appeal in this case be and the same is dismissed, and this cause is remanded to the circuit court of Anderson county for further proceedings. A copy of the written opinion of the court will accompany the procedendo on the remand of the case to the court below.''

Upon a petition to rehear, filed on July 22, 1924, and upon diminution of the record, it was demonstrated to the court of civil appeals that the bill of exceptions had been properly filed in the circuit court on August 16, 1923, and the court of civil appeals, on August 2, 1924, entered an order or decree vacating its previous order or

decree as to the bill of exceptions not having been filed, etc. This order adjudged that the bill of exceptions had been properly filed, but reaffirmed that part of its previous order or decree which dismissed the appeal as premature because no judgment had been entered, and also that part which remanded the case to the circuit court. In other words, the final decree or order of the court of civil appeals simply dismissed the appeal as premature because no judgment had been rendered in the circuit court, and remanded the case for further proceedings.

On August 27, 1924, the matter of entering a judgment nunc-pro-tunc in the circuit court was presented to Judge Morison in open court, but he declined to enter the judgment. The plaintiff claims, and introduced parol evidence to that effect, that this was because the procedendo from the court of civil appeals had not then been received and filed in the circuit court. The defendant claims that Judge Morison refused to enter the judgment nunc-pro-tunc because he was of the opinion that there was nothing on the record to show that the judgment had been rendered; and the defendant introduced in evidence a memorandum which Judge Morrison had made at the time; as follows:

"Nunc-pro-tunc order at subsequent Term:

"To justify a nunc-pro-tunc order or entry, at a subsequent term, there must be some matter in the nature of a record to pass it upon, such as (1) a decree actually drawn at the time, but by mistake not entered.; or (2) the entry on the court's docket, or (3) a memorandum or opinion in writing by the court. McGarock v. Puryear, 6 Cald., 34; Farris v. Kilpatrick, 1 Humph., 379; Newman v. Garner, 1 Heisk., 720; R. R. Co. v. Dodd, 9 Heisk., 179."

However this may be, the procedendo had not been received and filed, and Judge Morison did not enter the judgment nunc-pro-tunc.

At the September, 1924, term of the circuit court, Judge Buttram had supplanted Judge Morrison, and on September 15, 1924, the plaintiff filed a motion that the procedendo, which had been received by the clerk of the circuit court on September 4, 1924, be entered on the minutes. This motion was allowed and the clerk was ordered to enter the procedendo on the minutes; which he did. However, this procedendo quoted the first order or decree of the court of civil appeals, instead of the second or final one. But, as stated, both orders or decrees dismissed the appeal and remanded the case to the circuit court for further proceedings.

The plaintiff then filed a petition, or motion in the nature of a petition, asking the court to enter a judgment nunc-pro-tunc. This petition or motion quoted the minute entry containing the verdict of the jury (hereinbefore quoted) and also the order overruling

the defendant's motion for a new trial, allowing the defendant an appeal and granting defendant additional time in which to file a bill of exceptions (also hereinbefore quoted).

Judge Buttram allowed and granted plaintiff's petition, or motion in the nature of a petition, and a final order or judgment in favor of the plaintiff and against the defendant for $5,000, and all costs, was, on September 18, 1924, entered nunc-pro-tunc on the minutes.

The defendant did not then or later file a motion for a new trial, but to the action of the court in entering the order nunc-pro-tunc and in rendering judgment in favor of the plaintiff, it excepted and prayed and was granted an appeal to this court. It was granted permission to refile its appeal bond, which it did; and was allowed thirty days in which to file a supplemental bill of exceptions; which it did within the time allowed.

The first assignment of error raises the question that the trial court erred in entering the judgment nunc-pro-tunc, instead of ordering a new trial de novo. In support of this assignment, the defendant cites State v. True, 116 Tenn., 313, in addition to the decisions contained in Judge Morison's memorandum, hereinbefore quoted.

In opposition, the plaintiff insists that the defendant is not in position to make the question because it did not file a motion for a new trial after the entry of the judgment nunc-pro-tunc, citing in support thereof Railroad v. Johnson, 114 Tenn., 632, and Wise & Co. v. Morgan, 101 Tenn., 273. Plaintiff also insists that the circuit court did not commit error in entering the judgment nunc-pro-tunc.

We do not think it necessary to pass upon the question of whether the defendant should have filed a motion for a new trial after the entry of the judgment nunc-pro-tunc, because in our opinion there was no error in that action of the trial court.

Shannon's Code, section 5892, deleted of immaterial provisions, is as follows:

"5892. Duties of clerk of circuit court.—The clerk of each circuit court, in addition to the duties prescribed by article 1 of this chapter, is required:

"(1) ———

"(2) ———

"(3) Enter judgments.—To enter up judgment of the court on its records, after the verdict of a jury."

In Railroad v. Ray, 124 Tenn., 16, the Supreme Court held that under this Code section it is the duty of the clerk of the circuit courts as soon as verdicts are rendered to enter judgments thereon as a matter of course. It is pointed out that this section changes the common-law practice or procedure under which an interval existed between the entry of the verdict and the entry of the judgment

in which the motion for new trial, etc., was filed and acted upon. Since the section was enacted, the clerk as a matter of course, under the authority and direction of the section, enters the judgment as soon as he has entered the verdict, and the filing of the motion for new trial, etc., is subsequent to the entry of the judgment. If the motion for a new trial is sustained the verdict is set aside and the judgment, which the clerk has entered as a matter of course, goes with it. If the motion for new trial is overruled the judgment, which the clerk has already entered, automatically becomes final.

The plain result of this decision of the Supreme Court is that after a verdict has been rendered, the clerk, as a condition precedent to his entry of the judgment on the minutes, needs no authority from the court, either in the form of a written order or judgment signed by the court or O K'ed by counsel, or otherwise; because his authority to enter the judgment on the minutes is given by the Code section, itself, which makes it his duty to enter it. Therefore cases like Davis v. Jones, 3 Head, 602, which make the distinction between things omitted to be done altogether and things which were done but were omitted to be entered, really support the right of the trial court in the instant case to enter the judgment nunc-pro-tunc. This, because in the instant case, under the Code section, the "rendition" of the judgment should be regarded as a "thing which had been done," and the failure of the clerk to comply with the section by entering the judgment on the minutes, should be regarded as an "omission to enter that which had been done."

In Rush v. Rush, 97 Tenn., 279, a divorce case involving the entering of a judgment nunc-pro-tunc, the Supreme Court said: "And the lapse of time between the announcement of judgment and the making of this motion (for judgment nunc-pro-tunc) is of no importance; that which is important is, that the proof be clear and convincing that the judgment which it is sought to have entered is the one pronounced in the cause." Words in parenthesis ours.

In the instant case, when Judge Buttram entered the judgment nunc-pro-tunc, he had before him the most clear and convincing proof that a court can have, i. e. minute entries of his own court showing the verdict of the jury, the filing and overruling of the motion for new trial, and an appeal prayed and granted to the court of civil appeals. Besides this he had an appeal bond executed by the defendant which recited that judgment had been rendered, and a bill of exceptions signed by Judge Morrison which also recited that judgment had been rendered.

It seems to us therefore that the record of his own court, in the case under consideration by him, and without the aid of parol evi-

dence, conclusively showed that its failure to contain the judgment was due to mere oversight and inadvertance of the clerk and counsel, and that he was not in error in ordering the entry of the judgment nunc-pro-tunc. For the foregoing reasons the first assignment of error is overruled.

This brings us to a review of the case on the merits. The second assignment of error raises the question that there was no material evidence to support the verdict and judgment, and that the trial court erred in not directing a verdict in favor of defendant. As has been stated, the defendant moved for a directed verdict at the conclusion of the plaintiff's evidence. This motion was overruled, and, the defendant introducing no evidence, the case was submitted to the jury solely on the plaintiff's evidence, which shows the following:

The main entry of the mine was two or three miles long, and cross-entries extended from it on both sides. The coal which was dug from the ends and sides of these cross-entries was taken along the cross-entries to the main entry, and from there was hauled out in cars along the main entry. These cars ran on a track and were pulled by a motor. How many of these cross-entries there were does not appear; but it does appear that the accident happened in the main entry about a half mile from the entrance of the mine, and that there were only two cross-entries between the point where the accident happened and the main entrance.

Each morning a motor pulls some twenty-five to thirty-five cars from the entrance of the mine along the main entry to its end, and the miners are hauled in these cars to their places of work, or rather to the cross-entries leading to their places of work. The miners are brought out in the same way in the afternoon. The train, or "trip" as it is spoken of in the record, leaves the entrance of the mine about 7 o'clock each morning, and is in charge of a man who is spoken of as "conductor," "trip rider," or "trip braker." The miners are under his orders and control while riding, and he gives the signals to start and stop, etc. It is a part of his duties to place the "slippers" which operate in lieu of brakes and check the speed of the train. These "slippers" are metal pieces about thirty-two inches long and three and one-half or four inches wide. They are shaped very much like a runner of a sled in that they curve upward at the front end. Their bottoms are flat and they have flanges which hold them on the rail. They are applied by laying them on the rail in front of the car wheel, which runs onto them and causes them to slide along the rail under the wheel. The friction of the slipper sliding along the rail checks the speed of the car. They are applied while the cars are in motion, by persons riding in the cars at the time.

Shortly after 7 o'clock on the morning of February 4, 1921, the plaintiff who was the "conductor," "trip rider," or "trip braker," in charge of the train or "trip" which was hauling some seventy-five or eighty of the men to their work, and while riding on the rear end car, was injured while stooping or bending to place a slipper on the rail. His head came in contact with a "bump," "hump" or "rib" in the roof of the main entry, and he was bent or crumpled backward into the car, and injured in his left leg and hips.

Neither the plaintiff nor any of his witnesses were able to state what particular "bump," "hump," or "rib" plaintiff's head came in contact with. Nor could they designate the exact place of the accident, nearer than twenty-five or fifty feet. But they all say that the roof of the entry for some distance at the place where plaintiff was injured was rough and uneven. They say that as the coal was hauled by motor power instead of by mules, the roof was not as high as the roof of mines where mules are used, but they do not state what the height was. They say the roof varied both as to height and as to eveness, and that it was higher in some places than others, and rougher and more uneven in some places than others, but they all agree that it was very rough and uneven (for some little distance) at the place where plaintiff was injured. The roof was rock, sandstone and slate, and as we understand it, the entry was made by extracting the coal from the space now constituting the entry; and where the coal had been dislodged by drilling and blasting the roof was uneven and rough; but where the coal had been simply dug out the roof was fairly even; and as we further understand it, the height of the roof varied according to what the thickness of the vein of coal had been.

While the plaintiff could not state the exact spot where he was injured, that is he could not approximate nearer than twenty-five feet or more of it, yet he described the roof of the locality at which he was injured as follows:

"Along here close to this particular point, couldn't have been far away, the top was very irregular. I thought it had been shot out and (am) satisfied it had, and left one side hanging in the rib, where they catch the ratchet would be down and the hole ranges up and pot holes and catch next here and leave this hanging."

"Q. Rock hanging? A. Yes, between the points of the two holes.

"Q. About how far down from the top? A. In my best estimate anywhere from ten to twelve inches.

"Q. The roof of the mine is undulating? A. Don't understand.

"Q. Bumpy, series of bumps all the way through? A. I can't say all the way through.

"Q. You drill .it. out· and it, leaves it waving and undulated? A. Some places and some places not shot at all. ·

"Q. Let me ask you Mr. Robbins, if it would be possible if the company wanted to, to make these ribs and things that have dropped down, could they be knocked off with a hammer or something?

"Defendant·: We object to that because it is immaterial and irrelevant.

"Court: I will let him answer. Defendant excepts. ·

"A. Yes sir.

"Q. At little or much expense? A. Very little expense I should think.

"Defendant: I object to that as immaterial and irrelevant.

"Q. If you know? A. Sure it would be very little expense."

The plaintiff's witness, Lige ·Thacher, described the top at the place where plaintiff was injured as·being: "altogether rough top, some places lower than·others." · On cross-examination he was asked and answered the following:

"Q. It is impracticable to have a smooth surface like the top of this room? A. Yes sir.

"Q. And the.top was at this point rolling and undulated like the remainder of the mine entry ? A. Was not smooth."

The plaintiff's witness, Ben Nelson, testified as follows:

"Q. That top where he was injured, describe to the Court and Jury the condition of the top, tell what you could see by looking. A. Top was fairly good along there.

"Q. What was the shape of it? A. Got a little bumpy along there, here and there.

"Q. Places that hung down between them come close to car? A. Yes sir.

"Q. I ask you if it would be possible for the company to put its men there and use hammers to break these places off and make it uniform?

"Defendant: I object to that because it is immaterial and irrelevant. Overruled. Defendant excepts.

"Q. Could they have cut it off? A. Could not do it with hammers, I don't think.

### Cross-Examination.

"Q. Now Mr. Nelson, that top in there is just like other entries, waving and undulating? A. Yes sir.

"Q. You don't make it smooth like this ceiling, impossible and impracticable in the mines? A. Yes sir.

"Q. All mines are irregular in top? A. Yes sir.

"Q. How many have you worked in. A. Fifteen or twenty.

"Q. How long? A. Fifteen or twenty years.

"Q. That top is like all other tops of coal mines you have worked in? A. Yes sir.

"Plaintiff: I object to that. Objection sustained.

"Mr. Wright: I except to the court's action.

"Q. The top of this mine is undulating, irregular and waiving? A. Yes sir.

"Q. All the way along that entry? A. Practically.

The plaintiff's witness, Sherman Victory, testified as follows:

"Q. What was there about that mine top or roof to catch him and do that? A. I never noticed any hump, only the top very rough, very rough all along there, I never noticed if it was smooth or not.

"Q. The top of that mine was undulating like the top of all mines. A. Yes sir.

"Q. Nothing unusual about it? A. Nothing only its a motor mine and not a mule mine, lower mine, not high enough for sixteen hands mule.

The plaintiff's witness, Frank Cook, testified as follows:

"Q. This top along there, you know what kind of top that is whether it is sandstone or mixture? A. Principally blue slate.

"Q. What was the condition of the top as to being smooth or jagged or irregular? A. Just like all other places, good places and bad and high and low.

"Q. I ask you if with twenty-three years' experience it would be possible and practicable for the company to take hammers and cut them humps off that come down there and make it safe?

"Objected to by the defendant because immaterial and irrelevant. Overruled.

"A. Oh yes that could be done.

"Q. Tell you to look out for the top? A. Some places you better or you get your head cracked.

"Q. Everybody knew that, this top was just like ordinary top? A. Just like I told you, up and down.

"Q. That is true in all mines? A. Yes sir.

"Plaintiff objects to that. Objection sustained. Defendant excepts.

There was no evidence that the roof at the place where plaintiff was injured was lower than the roof at a great many places along the entry. The only direct evidence on this feature of the matter is the following from the plaintiff's witness Frank Cook:

"Q. Plenty of clearance at that point? A. I don't know.

"Q. Been slippering at that same place before? A. Before and since.

"Q. And seemed to be plenty of space. A. Yes sir.

"Q. And can go from one car to another at that point? A. Yes sir.

In view of the foregoing, it seems to us that a fair statement of the evidence is that at the place where plaintiff was injured the top was very rough and uneven and varied ten or twelve inches in height; that such tops are not unusual in coal mines; and that the top could have been made smooth at small expense, although it would have been impractical to have so made it.

Plaintiff, at the time of the accident was thirty-one years of age, and had been working in coal mines since he was fourteen years of age. Most of his time had been spent not in digging coal, but in coupling after motors, running motors, driving mules, working on the track, and trip work of that kind which carried him along the various entries of the mines in which he had worked. He had worked in ten or twelve different mines and was shown to be an experienced man. He had worked in defendant's mine off and on for twelve years, his total time in the defendant's employ aggregating several years. At the time of his injury he was the man in charge of the trip, and the seventy-five or eighty men riding with him were under his control and in his charge while riding on the trip.

He had worked as "conductor," "trip rider," or "trip braker," in the entry where he was hurt for a period of one month next preceding his accident, and at a previous time he had worked six months in this same entry. Also he had walked through this same entry. With reference to his knowledge of the place where he was injured he testified on cross-examination as follows:

"Q. You know just exactly where you was hurt? A. Can't describe the exact spot.

"Q. In fifty feet of it? A. Yes sir.

"Q. Twenty-five.feet? A. Could not say.

"Q. About. Could not tell within twenty-five feet? A. I might and I might not, I told you it kind of dazed me when it hit me.

"Q. Stretch of bumps along there? A. Not so far.

"Q. You knew this was the bumpy part of the entry, you were in under it every day? A. I knew there was bumps along there, yes."

Previously and while in the hands of his own counsel, he had testified as follows:

"Q. Did you know about these drop downs or bumps? A. Some of them I did, but at the particular point I can't say I did now from what I had noticed."

Later in his testimony he attempted to deny an intimate knowledge of the condition of the top at the place where he was injured, but we think it is manifest from his evidence taken as a whole, that he was entirely familiar with it.

He was asked if the Superintendent or any other "bosses" or representatives of the company ever pointed out to him the particular spot where he was injured, or gave him any instructions or warning about the irregularities in the top, or warned him of the danger therefrom; to all which he, of course, replied that they had not.

While he and one of his witnesses stated that at the time he was injured, he was in a proper position to place the "slipper," and that he was doing it in the proper, usual and customary manner; yet he and all the witnesses say that he was "straddling" the end of a car, and this end was eighteen inches higher than the floor or bed of the car. One of his witnesses said that he had never seen a man "slipper" a car in the manner plaintiff was doing. From this witness' testimony it would appear that the best way to "slipper" is to kneel on the floor or bed of the car which puts one in a lower position than "straddling" the end. However, this witness said that there are several ways to "slipper," and he does not show that plaintiff was negligent.

The trial court, in overruling defendant's motion for a directed verdict, said:

"I overrule that motion. There is no controversy at all in the testimony and I am of the opinion that there are facts in this case that ought to go to the jury and it would be improper for me to take the case away from the jury. It is not necessary for me to detail the facts that I base my opinion upon. The proof in this case, so far as I have heard, shows that it was not simply the natural undulations of the roof, but that there was a down projection—a point in the rock that projected downward because of the fact of the cutting out of this main entry, and that these projections have been left. There is testimony in this case showing that fact and showing it by a number of witnesses, also showing that these conditions could be easily removed. There is testimony in this case showing that the entry was narrow at places and from which it might conclude that it would be unsafe for a man to try to brake those cars by putting his arm out to one side. Now these questions appear in the proof and they are a matter in my opinion for the jury to consider."

We agree with the trial court that there was evidence tending to show that the width between the track and the side of the entry was not uniform, and that it would have been unsafe to "slipper" the car by leaning out over the side of the car, instead of over the end. In fact we think there was ample evidence to justify the trial court in submitting the question of the plaintiff's contributory negligence to the jury, and to support the jury's finding thereon in favor of the plaintiff. This, because plaintiff, being absorbed in the

"slippering" of the car, was not able to watch out for irregularities in the roof, as well as he otherwise would have been. But we doubt whether the proof in the record justifies the statement that: "The proof in this case . . . shows that it was not simply the natural undulations of the roof, but that there was a down projection—a point in the rock that projected downward because of the fact of the cutting out of this main entry, and that these projections have been left."

It is true that the roughness and unevenness in the top was not merely the undulations or irregularities in the natural formation of the rocky substance forming the top. The shooting and drilling, which was done in extracting the coal from under the top when the entry was being made, caused the roughness and unevenness. But there was neither one nor several projections or points which hung down lower than all others. Nor was the roof over the "place" where plaintiff was injured lower than it was over all other places. It was simply very uneven and rough like it was over other places along the entries in this and practically all other coal mines. We think this is a fair and impartial statement of the evidence taken as a whole.

But assuming that this unevenness and roughness, coupled with the testimony that it could have been knocked or beaten out with hammers, was sufficient evidence to support a finding that the defendant had breached its duty to exercise ordinary care to furnish plaintiff a reasonably safe place in which to work, it still would not follow that plaintiff was entitled to go to the jury. He admitted that he had knowledge of the rough and uneven place, and the record clearly shows that he understood and appreciated the dangers incident to working under it. Every witness who testified showed that they all understood and appreciated the danger of their heads coming in contact with the roof of the entry in the low and rough places like the one where plaintiff was injured, and indeed, this danger was so open and apparent that no one could have failed to realize and appreciate it. We might add that under the facts, as shown in this record, we think it would have been an idle ceremony for the Superintendent or any other "boss" to have warned or instructed this plaintiff about the dangers incident to the roughness and unevenness of the top of the entry at the place where plaintiff was injured. He had been working in this mine off and on for twelve years. He had been working as "conductor," "trip rider," or "trip braker" on this same trip for a month before he was hurt and he had previously worked in this same entry for a period of six months, and had walked through it. Almost all of his long experience in coal mines had been in a character of work which kept him constantly going through mine entries (rather than digging coal) and he is shown to be a thoroughly experienced

man in the same general character of work that he was doing at the time he was injured. We think the record taken as a whole not only shows that he was familiar with the condition of the roof at the place where he was injured, but that he thoroughly knew and appreciated whatever danger was caused by it. Under these circumstances we are of opinion that he must be held to have assumed the risk of the injury for which he has sued.

For the foregoing reasons, we think the trial court was in error in not directing a verdict in favor of the defendant. An order will, therefore, be entered reversing the judgment of the trial court and dismissing the plaintiff's case at his cost.

Snodgrass and Portrum, JJ., concur.