UNITED STATES RUBBER PRODUCTS CO. *v.* CANNON.

*(Nashville,* December Term, 1937.)

Opinion filed March 7, 1938.

666

BEN KINGREE, JR., of Shelbyville, and BASS, BERRY & SIMS, of Nashville, for plaintiff in error.

J. D. MURPHREE and L. S. HAUGLAND, both of Shelbyville, for defendant in error.

MR. JUSTICE CHAMBLISS delivered the opinion of the Court.

This is a compensation case, in which the trial court found permanent and total disability and made an award of $7.50 a week for 400 weeks, and $5 a week for 150 weeks.

It is conceded that petitioner was an employee of the company and received accidental injuries on May 5, 1937, while at work for the company. The insistence on this appeal by the company is threefold: (1) That petitioner was a casual employee only; (2) that his disability is not shown by material, admissible evidence to be total and permanent; and (3) that the average weekly basis adopted of $15 is too high.

Petitioner is a young negro, about twenty-one years of age, whose occupation was that of a common laborer. The defendant company is a large manufacturer of cord fabrics for auto casings, its plant being located a few miles from Shelbyville on a branch line of railroad, over which it habitually receives raw materials and ships out finished goods in carload, or less, lots. The record shows that it commendably maintains its extensive grounds surrounding the buildings in an attractive manner with grass and shrubbery, and employs laborers whose duties include grass cutting and other incidental work; that the duties of these common laborers include the loading and unloading of freight cars on the switch tracks of the company.

Petitioner had been working for the company something less than a month when injured on May 5, 1937. He was engaged to work, along with his brother Dorris, by Dick Clements, a master mechanic, who was his ''boss man,'' and who was at work with petitioner and his brother, directing them in unloading a load of lumber from a freight car when the accident to petitioner occurred. A heavy piece of lumber slipped and, swinging around, struck petitioner, who was standing on the car, and knocked him off. He fell some twenty feet, his head striking a large iron sewerage manhead. He was

stunned by the fall and blood oozed from his ears. His collarbone was broken and he was otherwise injured. Further reference to his injuries will be hereafter made.

■ Considering first the defense that petitioner's employment was casual only and not, therefore, compensable, it is not questioned that petitioner was working at the time in the usual course of his trade or occupation, that of common laborer, but this is not, of course, determinative, the test under our act, Code, 6856 (b), being whether or not the workman was employed when injured "in the usual course of trade, business, profession, or occupation of the employer." The company insists that the lumber being unloaded by petitioner was for use in the construction of an addition to its plant whereby its productive capacity would be enlarged; and that this construction work was not being done in the usual course of its business of manufacturing cord fabric. Our cases are relied on: *Murphy* v. *Gaylord,* 160 Tenn., 660, 28 S. W. (2d), 348; *Gibbons* v. *Roller Estates,* 163 Tenn., 373, 43 S. W. (2d) 198; *Parks* v. *E. M. Carmell Co.,* 168 Tenn., 385, 79 S. W. (2d), 285; *Dancy* v. *Abraham Bros. Packing Co.,* 171 Tenn., 311, 102 S. W. (2d), 526.

Other authorities, also, are cited for the general rule that construction work is not in the usual course of an employer's business, where the employer is not a contractor, or builder: 71 C. J., 444, section 180; *Holbrook* v. *Olympia Hotel Co.,* 200 Mich., 597, 166 N. W., 876; *Morse* v. *New Amsterdam Cas. Co., D. C.,* 30 F. (2d), 974.

It is to be observed that the exclusion rule approved by these authorities has been applied in those cases only in which the workman was working under a contract of employment which directly and exclusively called for re-

pair or construction work, as to which the employer was held to be engaged outside the usual course of his business, etc. The rule must be so limited. It is not to be extended to regular and general employees about a plant in connection with its usual business who happen to be at the time of the accident engaged, at the direction and under the supervision of the company's managers, on work of a repair or construction character.

What are the facts of the instant case with specific reference to this distinction?

Petitioner testified as follows:

"Q. 18. When you first went to work what kind of work did they tell you they wanted you to do?

"A. Unload box cars and work around on the yard.

"Q. 19. And do what?

"A. Work around on the yard, unload box cars, and machinery.

"Q. 20. What kind of work on the yard did they say you were to do?

"A. Unload box cars and machinery and lumber."

Petitioner's brother Dorris, who was working with him when the accident occurred and who had been employed at the same time and had been working with him for some weeks doing the same kind of work, testified:

"Q. 5. Do you remember when Walter had an accident?

"A. Yes, sir.

"Q. 6. Where were you working at that time?

"A. Working down at the Cotton Mill.

"Q. 7. You were working at the Cotton Mill?

"A. Yes, sir.

"Q. 8. How long have you worked there?

"A. I have worked there for about two months, I reckon.

"Q. 9. What did you do?

"A. I helped unload box cars and helped tear down a brick wall one Sunday. I was a yard hand."

There is no suggestion that, when employed weeks before, the employment of these men had any relation to the unloading of this particular car, and we think the foregoing was material testimony before the trial judge that their employment was not specifically restricted to the construction work on this addition to the plant. There is no evidence that petitioner even knew when he was engaged that this particular work was contemplated. Quite evidently this common laborer—and, while not determinative, the occupation of the employee may be looked to and has evidential value as bearing on the nature of the work of the employer with reference to which he was engaged—was employed generally as a "yard hand" in contemplation that he would do whatever he might be directed to do within this general classification, including unloading of "machinery", brick, lumber, or other articles from time to time. And, supporting this construction of the general scope of his employment as a "yard hand," it appears that following this accident, when petitioner endeavored to resume his work for the company, he was assigned to the cutting and mowing of grass on the lawn, and so worked intermittently for some time. It may be said that this assignment was given him at this time in view of his partially disabled condition, but we think the fair inference is that this was regarded and treated by the foreman and petitioner as within the scope of petitioner's employment generally as a "yard hand." And it is not

without significance that the record shows that another yard hand was taken from the grass work and shifted to the unloading work in this connection. This is not a case of a contractor doing repair construction work, or of a carpenter or brick mason engaged specifically to do such work. Such particular and restricted work was evidently not within the contemplation of the parties, either petitioner or the employer.

It may be remarked, in this connection, that in principle the reasoning of the rule in compensation cases excluding independent contractors has, by analogy, a degree of application. The contract of employment of carpenters and other builders in construction work outside the usual course of the employer's business ordinarily extends to the results only, and not to the oversight and direction of details of performance, and, therefore, fastens no liability on the employer for injuries incurred by the workman. The employer, not being in position to supervise or control the employee in these details, is relieved of responsibility for his misfortune. For illustration, the employer in *Dancy* v. *Abraham Bros. Packing Co., supra,* had no control whatever over just how this carpenter cut and handled the sheet of tin that hit his eye. Here, on the other hand, the company's foreman or "boss" stood by and explicitly directed the handling of the heavy timber that injured petitioner.

The trial judge thus states his findings on this phase of the case:

"The petitioner was not working as a mechanic or carpenter on the new building which was being erected by the defendant; he was not building any house or building, but he was unloading lumber from a freight car on a railroad track in the yard of the plant of the

defendant; he was working entirely away from the building which was being erected and separate and apart from carpenters and other workmen employed on said building, and working at an employment which was usual and in the usual course of business of the defendant, that is, unloading material from a freight car at the plant of the defendant, and working under the immediate and direct supervision of the master mechanic of the defendant. Certainly it is to be presumed that the defendant had shipments of cotton and other supplies delivered to it from time to time, perhaps daily, by the railroad company and in freight cars of the railroad company. If the petitioner had been engaged in the unloading of a bale of cotton from the freight car, or if he was engaged in unloading a machine or machinery from the freight car, or was unloading coal to be used in the furnaces for heating, or generating steam, or was unloading any other supplies or materials for the defendant, could it be insisted that his employment in such connection was not in the usual course of the business of the defendant? The Court is not able to see the difference between such employment and the employment which the petitioner had at the time when he was injured, and the Court is of the opinion that the injuries sustained by the petitioner are compensable under the Workmen's Compensation Law of this State, for the reason that his said injuries were sustained by him while employed in the usual course of the defendant's business.

"After the accident the defendant treated petitioner as an employee in the usual course of the business, gave him work such as he was able to do, recognized him as such employee and made a settlement with him and paid

him $3.00 as compensation under the law. The Court is of the opinion that defendant is now estopped to deny that he was such employee."

Counsel for the company stress the concluding sentence of the above finding and challenge the application of estoppel. We do not construe the judgment of the trial judge to be mainly rested on estoppel. Conceding, but not deciding, that estoppel does not apply, we think the finding otherwise sufficient and sustained by material evidence, and, for the reasons set out by him and those heretofore indicated in this opinion, we overrule this assignment based on alleged casualness of employment.

■■■■ While it appears to be conceded by counsel for the company that petitioner received injuries at the time and place and under the circumstances already shown, it is very earnestly contended that there is no material evidence to support the finding of the trial judge that the petitioner was totally and permanently disabled as a result of these injuries. And, in this connection, it is complained that the trial judge erroneously permitted the doctor introduced by petitioner to express an opinion based partly on subjective symptoms stated to him by the petitioner, particularly in view of the fact that the statements of the petitioner were made to the doctor, not in the course of treatment, but for the purpose of enabling him to testify.

It will be borne in mind that on this question, purely of fact, the finding of the trial judge is conclusive in this court, if supported by material testimony. It must be conceded that the testimony of this witness is subject to the objection that it lacks that definiteness which is to be desired and also to the objection that in part, at

least, it appears to have been based on statements made to him by petitioner in the matter, particularly, of the impairment of his hearing. However, as plainly appears from his findings, the trial judge most stressed and was most impressed by his personal examination and observation of petitioner on the trial, and it may be remarked in this connection that the examination, as shown by the record, tends to support quite definitely the finding as to this impairment of hearing, and also as to a vagueness of mental control and co-ordination, which is relied on. It has been repeatedly recognized by this court that the conclusions of the trial judge, based upon his personal examination and observation, are entitled to especial weight. There is considerable testimony that prior to this accident this young man was able-bodied and in normal mental condition, and that he was apparently free from the defects of sight and hearing, impairment of locomotion, and of average normal mentality, which these lay witnesses had observed since this accident. The proof shows that he had a very severe fall, alighting on his head on the large iron manhead, already mentioned, and the outward indications of injury, including the oozing of blood from his ears and the fracture of his collarbone, were quite apparent when he was carried to the company's emergency office and later examined and treated by the company's physicians, who, however, testify that they discharged him some weeks later as apparently recovered. It is shown that he attempted to resume his work, but was unable to do even light work for the company, to any satisfactory extent. Dr. Farrar testified that from his examination he was of opinion that petitioner was mentally impaired or deficient to a marked degree; that he was slow to

answer questions and slow of comprehension; and that his blood pressure was above normal. The trial judge not only had this testimony before him, but the testimony of petitioner himself, given orally, and the evidence afforded by his appearance and demeanor on the stand and in the court room, to which reference has already been made. Touching this matter, we quote from the findings of the trial judge, as follows:

"For several hours during each of the two days of the trial of this case the Court observed the petitioner in the Court room. He certainly did not have the appearance of a normal person. In fact he appeared to be most abnormal. He looked idiotic. He appeared to be oblivious of all that was going on in the trial; he sat in a chair away from his attorneys and seemed to take no interest whatever in the proceedings; he did not smile at any time that the Court observed and the Court did not observe any change of expression on his face or in his countenance; he kept his right eye closed all the time and part of the time his left eye was closed; he did not move his head or hands or his feet, as the Court recalls; he sat all the time in a fixed and rigid position and seemed to be insensible to his surroundings. When he took the witness stand to testify for himself his counsel had much difficulty in eliciting answers to questions propounded, and counsel for the defendant also had the same difficulty, and the Court could scarcely be understood by the petitioner when the Court undertook to interrogate him. Usually the questions had to be repeated, as the petitioner did not seem to comprehend or hear the questions when first propounded to him. He clearly manifested a difficulty of hearing and a difficulty of understanding. However, after he did hear and un-

derstand the questions, he answered with fair intelligence. He was brought up ,before the Court and close to the Court and the Court observed him and questioned him concerning his injuries, each question being asked in about the same tone of voice, and each time the petitioner failed to answer or respond to the questions when first asked by the Court. He appeared to be hard of hearing and slow of understanding and slow to answer, but usually answered or replied to the question when propounded the second time, and each time answered with fair intelligence.

"His movements in the Court room, whenever he undertook to move from one place to another, were slow. He held his hands to his side, and when he was called to the witness stand he appeared to have difficulty in stepping up one step and turning around and taking his seat in the chair. From the slowness and seeming carefulness of his movements in taking the witness stand it appeared that he was trying to avoid pain.

"From all that the Court observed of the petitioner during the trial the Court is of the opinion that petitioner is suffering from disabilities both of body and mind. He appeared to be in such condition as would render him incapable of working at an occupation which would bring him an income. The Court is therefore of the opinion that the petitioner is totally disabled from performing any work whereby he could earn a living. The Court is further of the opinion that the petitioner from the injuries which he sustained has suffered permanent total disability as defined in subsection (e) of section 6878 [Code 1932] of the Workmen's Compensation Law of this State."

While there is much conflicting evidence, much of it

directed on behalf of the company to a showing of petitioner's activities since the accident, we cannot escape the conclusion that the personal observations of the trial judge, as hereinbefore set forth, coupled with the testimony of petitioner and that of certain lay witnesses in his behalf, both as to his previous condition and as to his condition since the accident, and supported in some part at least by clearly competent testimony of Dr. Farrar, sustain the finding of total and permanent disability. In reaching this conclusion we are conceding the inadmissibility of so much of the opinion evidence given by Dr. Farrar as was based upon statements made to him by the petitioner. We are not satisfied, however, that this portion of Dr. Farrar's testimony had any appreciable influence upon the judgment and findings of the trial judge, and its admission, for this reason, does not constitute reversible **error.**

It is, of course, well recognized that the question of the permanency of many forms of disability is frequently one of doubt and difficulty, the future being quite commonly veiled in uncertainty. It is to meet this situation and prevent injustice that the law provides for the reopening of this issue and a readjustment of the award, if the facts appear so to demand. Code, section 6892, subsection (b).

The final complaint of the company is that the amount of average weekly wage adopted by the trial judge is without record support. As already stated, he adopted $15 a week. There is some evidence that this petitioner, as the result of working over time and on one or more Sundays, was paid as much as this amount, possibly slightly more, for a part of the few weeks in which he worked for this company. However, the rec-

ord shows practically without dispute that he was paid by the hour, as were other common laborers for the company, at the rate of 25 cents per hour. And the evidence is that forty hours a week was the regular weekly time, and that, therefore, the average weekly wage regularly and normally earned by and paid to workers in the class of petitioner was $10 a week. Petitioner offered no testimony that a larger wage than this was customarily paid to persons in the same grade of employment in the Shelbyville district. The rule applicable, as set forth in the Code, section 6852 (c), is as follows:

"Whereby by reason of the shortness of the time during which the employee has been in the employment of his employer, it is impracticable to compute the average weekly wages as . . . defined, regard shall be had to the average weekly amount which during the first fifty-two weeks prior to the injury . . . was being earned by a person in the same grade, employed at the same work by the same employer, and if there is no such person so employed, by a person in the same grade employed in the same class of employment in the same district."

We are of opinion that the trial judge erroneously adopted the occasional amount which the petitioner collected during a portion of the short period he was employed by the company as the basis for the award, but that, consistently with the Code provisions above quoted, he should have fixed the award, in accordance with the evidence above mentioned, at $10 a week, and we hold that the judgment below must be modified accordingly. With this modification the judgment is affirmed.