NASHVILLE BRIDGE CO. v. HUDGINS. No. 19.—137 S. W. (2d), 327.

Middle Section.   December 17, 1938.

Petition for Certiorari denied by Supreme Court, April 1, 1939.

678

Roberts & Roberts, of Nashville, for plaintiff in error.

Norman & Keefe and Louis Farrell, Jr., all of Nashville, for defendant in error.

McAMIS, J. Plaintiff W. H. Hudgins instituted this suit against his former employer, Nashville Bridge Company, to recover damages in the sum of $10,000 for alleged personal injuries resulting from the inhalation of particles of paint containing lead while he was engaged as a painter in the employ and working under the direction of defendant. The declaration avers that the defendant failed to provide plaintiff with a reasonably safe place in which to work and, particularly, that it failed to provide proper safeguards for the removal of paint particles from the atmosphere and, as the proximate result of defendant's failure to do so, plaintiff contracted lead poisoning.

As originally filed, the declaration contained both a statutory and a common law count but, upon motion of defendant, a verdict was directed in its favor upon the statutory count. Defendant's motion for a directed verdict under the second count of the declaration was overruled and the case submitted to the jury with the result that plaintiff obtained a verdict in the sum of $4,000.

Its motion for a new trial having been overruled defendant has ap--

pealed to this court and insists (1) that no actionable negligence has been shown, (2) that plaintiff, with knowledge and appreciation of an extraordinary risk incident to his employment, assumed the risk and was guilty of contributory negligence (these being treated as synonymous and interchangeable terms), and (3) that, in any event, the judgment should be reversed and remanded for a new trial because of errors in the court's charge and refusal to charge certain special requests tendered by defendant.

Plaintiff is a man approximately thirty-two years of age. At the time in question he had been employed by defendant for a period of six or seven years. Before that time he was a common laborer and, apparently, he is a man of limited education. During all or the greater part of his employment by defendant he worked with a spray gun painting barges, bridge steel and steel structures. It appears that he had had little or no experience as a painter before going to work for defendant and that he learned his trade while in defendant's employ. During this period he was instructed by defendant's foreman in the use of a respirator which he was required to use while painting with a spray gun on inside work. On all such work, previous to the time here in question, defendant had also provided for his comfort and safety a suction fan for the removal of paint particles from the atmosphere.

In July, 1936, plaintiff was sent to Coal Creek, Tennessee, to paint certain barges which defendant had contracted to furnish the Tennessee Valley Authority. He took with him a suction fan for the purpose of exhausting the paint laden atmosphere from the interior of the barges in the same manner he had been accustomed to doing while in defendant's employ in Nashville. Upon arriving at Coal Creek this equipment was delivered to the Superintendent of Construction, Mr. McMurtry.

Upon attempting to install the suction fan it was discovered that it could not be used because the voltage available was too strong to be used with this particular fan. Mr. McMurtry thereupon made an attempt to locate a transformer in nearby towns but was unable to do so and plaintiff was put to work on the interior compartments of the barges without the use of a suction fan. Small fans of ordinary design were provided as a substitute but plaintiff says they were wholly ineffective and were removed during the progress of the work because they were only in the way.

Each of the barges was divided into twelve airtight compartments approximately 9' X 9' and 4 feet in depth. The only access to these compartments was by means of a circular manhole 16 inches in diameter at the top of each compartment. These compartments, containing approximately 900 cubic feet of air, were the smallest in which plaintiff had ever worked, the ones in which he had previously

worked being approximately fifteen times as large, resulting in a much greater concentration of paint particles in the atmosphere.

When plaintiff arrived at Coal Creek there were four barges to be painted. Using a respirator provided by defendant and designed to fit over the face of the operator of a spray gun in the manner of a gas mask for the purpose of preventing, as far as possible, the inhalation of paint particles, plaintiff went to work painting both inside and outside the barges. He was engaged in this work approximately thirty days. On the 4th or 5th of August, about three or four days before the work was finally completed, plaintiff began to get sick at his stomach. He complained to Mr. McMurtry but was told ''not to lay down on him (McMurtry), to go ahead and finish the job, that I (plaintiff) would be alright.'' Plaintiff so testified and McMurtry admits the substance of this conversation except that he denies telling plaintiff that he would be alright if he continued on the job. It appears that plaintiff had determined to quit the job because he was sick but, after the conversation with McMurtry, he went back to work and finally finished all of the barges.

After consulting a physician at Coal Creek, he returned to Nashville and was taken to the Vanderbilt hospital where an examination revealed that he was suffering from an acute attack of lead poisoning. The extent of his disability will be adverted to hereinafter.

██ We have no difficulty in concluding that these compartments were not a safe place in which to work without suction fans. It is insisted that suction fans were provided only for the comfort of the painter and not as a safety measure but it is shown that the exhaust from these fans was so impregnated with paint particles as to color it and make it visible. That one effect of the use of these fans is to reduce the danger of inhaling lead is clearly shown. Defendant's failure to shut down the work until a transformer could be provided may have been found by the jury to constitute a breach of duty. It was defendant's duty to exercise a degree of care and caution commensurate with the attending danger to its employee.

██ It is also insisted that lead poisoning is an occupational disease for which an employer is not responsible even though it failed to provide a reasonably safe place in which to work.

Responding to a similar contention, in Connell v. Fisher Body Corp., 56 Ga. App., 203, 192 S. E., 484, 486, the converse rule was applied in the following apt language:

''In so far as these cases refer to an occupational disease as one which arises from causes incident to the profession or labor of the employee's occupation or calling, having its origin in the inherent nature or mode of work of the profession or industry, and being the usual result or concomitant thereof in spite of due care on the part of the employer, we agree with the principle thus announced. However, in so far as it may refer to a disease which arises purely from

the negligence of the employer, we have no difficulty in giving our dissent thereto."

The court concluded that "it is just as much the duty of a master to use reasonable care to protect his servants against dangers of the employment which may reasonably be expected to produce disease as it is to use reasonable care to protect his servants against dangers of the employment which may produce physical injuries." See also Zajkowski v. American Steel & Wire Co., 6 Cir., 258 F., 9, 6 A. L. R., 348; Thompson v. United Laboratories, 221 Mass., 276, 108 N. E., 1042, and Kane v. Federal Match Co. (D. C.), 5 F. Supp., 507, also Jellico Coal Co. v. Adkins, 199 Ky., 648, 247 S. W., 972.

■ If, as is universally recognized, the employer owes the duty of providing a safe place for the employee to work and is guilty of a negligent breach of this duty, thereby introducing a new and added danger and the employee does not assume the risk of such supervening dangers, and contracts a disease as the proximate result of such omission of duty, it would seem upon principle that the law should not deprive him of an action for damages. We think the principle announced by the foregoing cases is sound. The first assignment of error that there is no evidence to support a finding of negligence on the part of defendant is accordingly overruled.

■ As to the defense of assumption of risk and contributory negligence relied upon as a bar to plaintiff's suit, we think a jury question was presented.

Plaintiff admitted on cross-examination that he knew that painters sometimes become afflicted with painters' colic and knew when he became ill that the cause of his illness was painting under the conditions already described in this opinion. He further admitted that he took chances on being made sick because he needed the money. However, it does not appear that he realized that he was likely to suffer more than a passing discomfort or illness though he had apparently determined to discontinue his work until, upon making complaint to the Superintendent, he was assured that he would be alright if he continued and was made to understand by the Superintendent's reply to his complaint that if he refused to do so and "laid down on the job" he would be branded as an unfaithful and untrustworthy employee. The jury may have inferred from the fact that he changed his mind and resumed his work that he was lead to do so by the Superintendent's assurance that he would be alright.

. Defendant cites and relies upon a number of cases where the employee continued to work in the face of impending and known dangers, the probable effect of which the employee understood and appreciated, including Brown v. Railway, 101 Tenn., 252, 47 S. W., 415, 70 Am. St. Rep., 666; Moore v. Railroad, 119 Tenn., 710, 109 S. W., 497, Acme Box Co. v. Gregory, 119 Tenn., 537, 105 S. W., 350; Norman v. Railroad, 119 Tenn., 401, 104 S. W., 1088; and Wind Rock Coal, etc.,

Co. v. Robbins, 1 Tenn. App., 734. All of these cases involved circumstances where the employee continued to face an extraordinary hazard which was patent and obvious, importing a realization of the possibility of a violent death or serious physical disability and injury.

We think the same rule may properly be applied, dismissing for the time being the effect of assurances of safety by the employer, where the risk of becoming affected with a serious disease is obvious and patent or should be so to a person of ordinary intelligence, but is not to be so readily applied to a case where the employee exposes himself to a condition which may result in a disease of the insidious nature of the one involved in this case, the nature and effect of which he but vaguely understands. Many workmen of reasonable prudence and intelligence who would refuse to continue to work in the face of the hazards considered in the cases cited might continue to work under conditions of the second class and we think it was for the jury to say whether plaintiff knew and appreciated the danger to which he was subjecting himself.

It is true plaintiff knew and realized that he had developed a headache and a general aching condition as a result of breathing the atmosphere in which he worked but it does not appear that he knew, if such was the case, that these were symptoms of the dangerous and acute disease of lead poisoning.

A similar case, in which plaintiff was suing for damages for lead poisoning contracted while working in the defendant's employ, was before the Supreme Court of California in the case of Pigeon v. W. P. Fuller & Co., 156 Cal., 691, 105 P., 976, 979. A recovery in behalf of the disabled employee was sustained, the court saying:

"Entire ignorance of the danger on the part of plaintiff was not therefore essential to a recovery. He was entitled to a verdict and judgment if he satisfied the jury that he had some degree of knowledge of the dangerous character of the employment, but did not understand or appreciate its full nature or extent. He may, for example, have observed that the melted pig lead gave off fumes, and that dust arose from the white lead in the process of manufacture, and that this involved the possibility of some degree of discomfort or injury, without realizing or understanding that the very serious disorders from which he claims to be suffering were a probable consequence."

We are further of opinion plaintiff may have been found by the jury to be warranted in relying upon Mr. McMurtry's assurance that he would be alright if he continued to work, notwithstanding he had had six or seven years' experience as a painter and was familiar, to an extent, with the effect of breathing paint particles containing lead. He had learned his trade under defendant. Defendant, through its practice of furnishing safety appliances during his period of employment when necessary, its previous intolerance of any

violation of safety measures and the fact that it had assumed to direct plaintiff in these matters naturally induced the belief in plaintiff's mind that defendant's agents were not only competent to advise him but were interested in his safety and welfare. Aside from one slight illness some four years previous to the time in question, he had never suffered from lead poisoning while working under defendant's direction and, under all the circumstances, we think it was a question for the jury to determine whether plaintiff acted as a reasonably cautious and prudent person would have acted under the same or similar circumstances. It may be presumed in case an employee is ordered to do certain work that the employer has superior knowledge of the perils attending performance. It is said that if the case is in doubt, this presumption must prevail in behalf of the plaintiff. 18 R. C. L., 659. We are unable to say as a matter of law that the parties were upon a parity and possessed of equal knowledge and that plaintiff should have adhered to his original impulse to discontinue his employment instead of yielding to the assurance of Mr. McMurtry that he would be alright if he continued to work.

Unless the employee knows that the assurance of safety is not based upon knowledge of the employer, he does not assume the risk even though their knowledge may be actually the same (Grey Eagle Marble Co. v. Perry, 138 Tenn., 231, 197 S. W., 674) unless "the danger was so glaring that a man of ordinary prudence would not have continued to work," the assurance, in such a case, being equivalent to a statement to the servant that the master has a knowlege of the matter superior to that of the servant, and that the latter can rely upon the information given. Chattanooga v. Powell, 133 Tenn., 137, 179 S. W., 808, 809. Copious notes, upon this subject, may be found in 7 Ann. Cas., beginning at page 439. These notes show that many courts hold that where the employee is ordered to perform an act by his employer he is not required to balance the degree of danger and decide with absolute certainty whether he must do the act or refrain from it, though if the danger be glaring to the extent that no prudent man would have entered into it the danger is assumed by the servant.

What has just been said with reference to dangers of a glaring nature is responsive to defendant's seventh assignment of error and both the second and seventh assignments are overruled.

By the fifth assignment it is insisted the court erred in declining to charge the jury that if it should find from the evidence that the risks of the work in which plaintiff was engaged were extraordinary but that plaintiff had knowledge of such dangers, he should be held to have assumed the risk. The request as tendered leaves out of consideration the right of plaintiff to rely upon assurances of

safety and is, to that extent, incomplete and inaccurate.   For this reason we think the request was properly declined.

The third assignment of error is directed to the court's charge with respect to the burden of proof.   After charging the jury that defendant denied liability for plaintiff's alleged ailment of lead poisoning because he was an experienced painter and knew, or should have known and appreciated the danger of becoming affected with said disease or ailment and insisted that plaintiff was guilty of contributory negligence in continuing to work under the circumstances; that lead poisoning was one of the ordinary risks and dangers incident to the work in which plaintiff was engaged; that defendant denied that plaintiff was given any assurances of safety by the foreman McMurtry, and, finally, that defendant claimed that the purpose of the exhaust fan mentioned in the proof was only to cool the atmosphere for the comfort and convenience of plaintiff and not to protect him from inhaling poisonous vapors, the court charged the jury as follows:

''If you find from the preponderance of the evidence in the case as herein defined, that defendant's said contentions or claims, or any of them, are true, your verdict should be in favor of the defendant.''

It is insisted that this charge placed the undue and unwarranted burden upon the defendant of establishing its defenses by a preponderance of the evidence.   For plaintiff it is admitted that this charge of the court is erroneous but it is insisted that the error was not prejudicial to defendant's case.

Pretermitting the question, not raised by plaintiff in justification of the charge complained of, that this charge might have been proper in respect to the defense of assumption of risk and contributory negligence (Memphis St. Ry. Co. v. Graham, 3 Tenn. Civ. App. (3 Higgins), 533; Wiles v. Lightman, 4 Tenn. Civ. App. (4 Higgins), 80) we are unable to escape the conclusion that the charge as applied to the other defenses, and particularly the defense that no assurance of safety was made by defendant, was prejudicial to the extent of requiring a remand of the case for a new trial.   If plaintiff knew and appreciated the danger he could escape the effect of such knowledge only by showing by a preponderance of the evidence that he was assured of safety and relied upon such assurances to his injury.   Upon this issue only two witnesses testified and their testimony is in direct conflict, thus making a closely drawn issue of fact which defendant was entitled to have weighed by the jury under a correct guide from the court.

It is insisted that the jury was correctly charged elsewhere in the court's charge in respect to the burden of proof but all of these charges relate to the burden resting upon plaintiff to make out his case by a preponderance of the evidence.   This portion of the charge is in conflict with the charge complained of and must have tended to

confuse the jury. In addition, it ignores the possibility that the evidence might be in equipoise, a contingency nowhere else covered by the charge, in which event defendant would be entitled to a verdict.

A charge of similar import and not materially different from the one here complained of was held erroneous and prejudicial in Nashville Railway & Light Co. v. Dungey, 128 Tenn., 587, 163 S. W., 802. Such an error is regarded as ground for reversal if it places the burden on the wrong party or places on the proper party a greater burden than that required, especially if the case is close upon the facts. See 5 C. J. S., Appeal and Error, section 1763, p. 1113, where numerous cases in accord with this view are cited in the footnotes.

The judgment below will be reversed and the cause remanded for a new trial.

Portrum and Ailor, JJ., concur.