# D. M. Rose & Co. v. Snyder.

*(Knoxville,* September Term, 1947.)

Opinion filed November 29, 1947.

500

502

504

DONALDSON, MONTGOMERY & KENNERLY, of Knoxville, for plaintiff in error.

JOE C. THOMASON and FRANK L. FLYNN, both of Knoxville, for defendant in error.

PER CURIAM:—On the allegation that a relation of master and servant existed between plaintiff, Snyder, and defendant, D. M. Rose and Company, Snyder sued

the Company for injuries received in the course of his employment and proximately caused by the Company's negligence. On the fourth trial of the case in the Circuit Court of Knox County, plaintiff secured a judgment for $20,000 against D. M. Rose and Company. After motion for new trial was overruled and the judgment approved by the Trial Judge, defendant appealed to the Court of Appeals. That Court sitting *en banc,* with nine Judges participating, heard the appeal and unanimously approved a clear, careful and complete opinion by Judge FELTS in which all assignments of error were considered separately and overruled, and the judgment affirmed.

We granted *certiorari,* have heard argument and carefully considered the very comprehensive briefs and supplemental briefs filed by both parties. No question of fact or law which was not presented to the Court of Appeals, is presented to us, except a minor matter which arose in the course of the argument before us and which we consider below.

In presenting his assignments of error in support of his petition for *certiorari,* the petitioner, D. M. Rose and Company, frankly admits that the petition contains only reassignment of errors already presented to the Court of Appeals, and says: "The Defendant herein made the following assignments of error in the Court of Appeals to the action of the Circuit Court . . . To save repetition in subsequent assignments of error, assignments of error in the Court of Appeals which are to be relied on here will just be recopied, inasmuch as the Court of Appeals overruled all of our assignments of error and it will be understood that we are assigning as error the action of the Court of Appeals in so doing."

Much that was said by this Court in the course of the opinion in *Mayor and City Council of Nashville* v. *Patton,*

125 Tenn. 361, 370, 143 S. W. 1131, is opposite to the present petition.

Our conclusion, after hearing argument and studying the record, is that the Court of Appeals has fully answered all the questions presented and correctly decided the case. To rewrite the opinion on the same assignments would serve no useful purpose and we, therefore, adopt the opinion of the Court of Appeals as the opinion of this Court. *Boillin-Harrison Co.* v. *Lewis & Co.*, 182 Tenn. 342, 345, 187 S. W. (2d) 17.

"Boyd Snyder brought this common law action against D. M. Rose & Company, as his employer not operating under the Workmen's Compensation Act, [Code, section 6851 *et seq.*], to recover $50,000 damages for personal injuries suffered by him when an excavation, being made for a house to be erected, caved in and fell upon him.

"The cause of action alleged was that D. M. Rose & Company, a corporation, was making the excavation and constructing the house, and owed him a duty to use reasonable care to furnish him a safe place to work; and that, in several particulars set out, it breached this duty and was guilty of negligence which caused him serious and permanent injuries described.

"He obtained an order requiring defendant to plead specially its defenses (Code sec. 8767); and in addition to the general issue, it pleaded that while it had more than five employees at its plant, several miles from the scene of the accident, and was not operating under the Workmen's Compensation Law, it had no employee at the scene, was not constructing the house, was only furnishing materials to the contractor doing the construction, and did not employ the subcontractor making the excavation or have any control or right of control over him or his employees.

"The accident happened April 25, 1940, and there have been four trials. The first resulted in plaintiff's taking a nonsuit and bringing the present suit. On the second trial a verdict was directed for defendant at the close of plaintiff's evidence. Upon his appeal in error to this Court, the Western Division, in an opinion by Judge BAPTIST January 27, 1943, unreported, held plaintiff's evidence made a case for the jury, reversed the judgment of dismissal, and remanded the case for a new trial, *certiorari* being denied. After the remand defendant was allowed to add another special plea that if it employed plaintiff such employment was 'casual and not in the usual course of trade, business, profession or occupation of the employer as set out in Code Section 6856, subsection (b).' Upon the third trial the jury could not agree and there was a mistrial. The fourth and last trial resulted in a verdict and judgment for plaintiff for $20,000.

"From that judgment defendant prosecuted this appeal in error, and has assigned numerous errors, insisting that a verdict should have been directed for it, or in any event it should have been granted a new trial for errors in instructions given, in requested instructions refused, and in other matters set out.

"The grounds urged for a directed verdict are (1) that there was no evidence of any relation of employer and employee between plaintiff and defendant; (2) that there was no evidence that it was guilty of any negligence which proximately caused his injuries; (3) that the evidence showed without dispute that if defendant employed plaintiff such employment was 'casual' and his action was barred by his assumption of the risk and the fellow-servant rule; and (4) that he was also barred by judicial

estoppel because his testimony on the last trial was contrary to what he had sworn on the first one.

"Grounds (1) and (2) were decided against defendant on the former appeal. It, however, contends that those rulings are not now the law of the case because the evidence was different on the last trial; that on the former appeal there was no evidence except plaintiff's while on this appeal there is also the evidence adduced by defendant; and that this evidence removed the basis of the former rulings and entitled defendant to a directed verdict on the grounds stated.

██ ██ "While these issues involve a review of the evidence, such review is not to determine where the truth lies or to find the facts, that not being our province in jury cases. It is only to determine whether there was any substantial evidence to support the verdict; and it must be governed by the rule, safeguarding the constitutional right of trial by jury, which requires us to take the strongest legitimate view of all the evidence to uphold the verdict, to assume the truth of all that tends to support it, to discard all to the contrary, and to allow all reasonable inferences to sustain the verdict. *Johnston* v. *Cincinnati N. O. & T. P. R. Co.*, 146 Tenn. 135, 149, 240 S. W. 429; *Finchem* v. *Oman*, 18 Tenn. App. 40, 49, 50, 72 S. W. (2d) 564, 570.

"Upon such review it appears that D. M. Rose & Company, a corporation, had a sawmill and plant in Knoxville where it was manufacturing and selling lumber and other wood products. Its witnesses said this was its only business, but many circumstances were proved to indicate that it did more than merely furnish materials to others and was itself engaged in the business of constructing houses and was contructing the one here involved.

"Its charter stated one of its corporate purposes was 'building houses' and, while it had not obtained a contractor's privilege license, it was shown to have bought several vacant lots and built houses thereon for sale. It kept a number of carpenters and workmen engaged in the building of houses, and kept in its regular employ an architect to draw plans and specifications for the construction of houses. Its salesman would call on prospective home-owners, show them these plans and specifications, and solicit them to enter into contracts for the construction of houses; and this architect would supervise the construction of the houses to see that it complied with the plans and specifications and met the requirements of the F. H. A. and other lending agencies financing the construction. It had a mimeographed form of construction contract and other forms of applications for loan commitments, releases of liens, etc., which it regularly used in its business.

"The owner of this house for whom it was being constructed was Max Wolf, a business man in Knoxville. He was not called as a witness but other evidence, largely the cross-examination of defendant's witnesses, brought out many of the circumstances as to the making and carrying out of the contract for the construction of this house. During January and February, 1940, Walter Johnson, defendant's salesman, went to see Max Wolf and wife several times to solicit them to make a contract for the construction of the house. He showed them defendant's plans and specifications and after conferences with them he and defendant's architect finally worked out such changes in the plans and specifications as were satisfactory to Mr. & Mrs. Wolf. Johnson agreed with them upon the terms of the contract, and defendant pro-

ceeded with it, though it was not formally signed until later.

"On March 11, 1940, defendant entered into a contract with the Save Plumbing Supply Company to furnish and install the plumbing and heating for this house, which amounted to some $1,400. On March 12, defendant had Max Wolf and wife execute an application to the F. H. A. for a loan commitment. This application stated one John Blazer was the contractor, but the Wolfs did not know him and had never seen him. He had no contractor's license, no office, no bank account, and seems to have been one of the carpenters employed by defendant for the construction of houses.

"On April 1, 1940, defendant's salesman, Johnson, carried Blazer to the Wolf lot, introduced him to Max Wolf, produced one of defendant's mimeographed form contracts, which had already been filled out, and had Max Wolf and Blazer sign this contract on the fender of his automobile. This contract made defendant's plans and specifications a part of it. It provided that all the materials were to be bought from defendant except such as it did not handle; and it contained this provision: 'It is hereby agreed by both parties to this contract that D. M. Rose & Co., or its duly appointed representative, shall have supervision of building and shall say whether or not plans and specifications are being carried out, and wherever superintendent is mentioned, in this contract, it shall be taken to mean D. M. Rose & Company or its representative.' (Ex. 1 to Test. of George Smith.)

"This contract required the owner to pay the contractor $1,000 before the work was begun, to meet the payrolls. So on April 4 defendant had Wolf and wife to make a note to it for $1,000, secured by a mortgage on the lot. It received the proceeds of this note before any

work was done. After the house was finished defendant received the balance of the contract price. Defendant received all the contract price, John Blazer received no part of it. Defendant purchased and paid for all the materials of every sort that went into the building, furnishing the lumber itself and purchasing all the other materials from other persons; and it employed and paid for all the labor used in the construction.

"Early in April, 1940 defendant employed Herman Hickman to do the excavating for the basement. Its salesman, Walter Johnson, went to see Hickman, asked him if he wanted another job, and told him to come to defendant's office the next morning. He went and Johnson sent him with two other men, John Blazer and a Mr. Davis, out to the job to estimate the amount of excavating to be done. Hickman came back to defendant's office made an agreement with Johnson to do the work for 35c per yard, and Johnson told him when to go to work. He brought his truck, team of horses, scraper, tools, and three or four men, including plaintiff Boyd Snyder; and they began the work.

"About this time, before any lumber or material had been delivered, defendant erected on the lot two of its large advertisements: 'D. M. Rose & Co. There is a difference. Lumber. Mill Work. Oak Flooring. Knoxville, Tennessee;' and, along with Blazer and Davis, it sent its employee, Walter Johnson, there to supervise the work. He came almost daily and gave instructions to Hickman, plaintiff Snyder, and the other men as to the details and manner of doing the work, directing them from time to time where to pile the dirt, cautioning them not to allow any of it to get on the sidewalk or into the street, etc. He, however, did not warn them of the dangers attending the work, did not instruct them to

shore up the walls of the excavation, and did not furnish any materials for doing this.

"The lot was not level and the excavation had to be about nine feet deep at the deepest part. During the month of April while the work was in progress, it was a rainy season and the ground was wet, 'brittle, hard and crumbly.' Snyder was inexperienced, had never done any similar work before, was unaware that the excavation might cave in, and was not warned of the danger. He was in the deepest corner, where the excavation was about nine feet deep, and was using a mattock, 'straightening up the bank back in the corner.' As he made a downward stroke with the mattock the wall at his back slid in, a ton or so of dirt fell upon him, covered his body, pressed the end of the mattock handle into his pelvis, breaking the pelvic bones, rupturing the urethra, injuring the bladder, genital organs, and abdomen. Hickman called D. M. Rose & Company on the telephone, Johnson answered, was told of the accident, and directed Hickman to 'take him (plaintiff) to the hospital and see that he got the best care and he (Johnson) would come out.'

" (1) Upon these circumstances we think the jury could reasonably conclude that John Blazer was not the contractor with Wolf but only an employee of defendant; that defendant was the contractor with Wolf and was doing all the work, including the excavation; that Herman Hickman was not an independent contractor but an agent or servant of defendant; and that defendant was the employer or master of plaintiff and he its employee or servant.

"As we have seen, Wolf dealt with defendant, not with Blazer. He agreed on all the terms of the contract with defendant through its agent Johnson, without knowing Blazer. He paid all the contract price to defendant.

Blazer received none of it and nothing except what defendant itself paid him each week for labor. Defendant not only received all the contract price, but it also procured and paid for all the materials and labor that went into the construction. In short, defendant, not Blazer, performed the contract.

■ ■ "As part of its performance, defendant employed Hickman to do the excavation, and Hickman employed plaintiff and the others to help do it. Defendant, however, retained control over all of them to direct them how to do it. The contract with Wolf reserved to defendant 'supervision of building,' which it took to mean control of the details and methods of doing the work; and through its agent Johnson it exercised such control over these laborers doing the excavation. This being so, Hickman was a servant, not an independent contractor. In the leading case of *Powell v. [Virginia] Construction Co.*, 88 Tenn. 692, 697, 13 S. W. 691, 692 [17 Am. St. Rep. 925], Judge LURTON gave perhaps the best, and the now generally accepted, definition of an independent contractor in these words:

"'An independent contractor is one who, exercising an independent employment, contracts to do a piece of work according to his own methods and without being subject to control of his employer, except as to the result of his work. The employer of such a contractor, if he be a fit and proper person and the work be not in itself unlawful, or a nuisance in itself, or necessarily attended with danger to others, will not be responsible for his negligence or that of his sub-contractors or his servants. Mr. Thompson, in his work upon Negligence, says that "in every case the decisive question is, Had the defendant the right to control in the given particular the conduct of

514

the person doing the wrong?'' Thompson on Negligence, 909.'

''The definition given by the Restatement of the Law of Agency, sec. 2, (3), is this: 'An independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking.'

■ ''This right of control is the distinguishing mark which differentiates the relation of master and servant from that of employer and independent contractor. Other factors are looked to only to aid in determining whether such right existed in a given case. See Restatement of the Law of Agency, sec. 220, for an enumeration of such factors. Wherever the defendant has had such right of control, irrespective of whether he exercised it or not, he has been held to be the responsible principal or master. Some of our cases illustrating the application of this rule are: *Gulf Refining Co. [of Louisiana]* v. *Huffman & Weakley*, 155 Tenn. 580, 297 S. W. 199; *Mayberry* v. *[Bon Air] Chemical Co.*, 160 Tenn. 459, 26 S. W. (2d) 148; *Marshall* v. *[South Pittsburg] Lumber & Coal Co.*, 164 Tenn. 267, 47 S. W. (2d) 553; *Welch* v. *Reiling et al.*, 170 Tenn. 698, 99 S. W. (2d) 216; *Morrison* v. *National Life & Acc. Ins. Co.*, 179 Tenn. 18, 162 S. W. (2d) 497; *[National Life & Acc. Ins. Co.* v. *Morrison]*, 179 Tenn. 29, 162 S. W. (2d) 501; *McVeigh et al.* v. *Brewer*, 182 Tenn. 683, 189 S. W. (2d) 812; *Ely et al.* v. *Rice Bros. et al.*, 26 Tenn. App. 19, 167 S. W. (2d) 355.

■ ''Where employment appears, the presumption is that one doing work for another is a servant, and the burden is upon the employer to prove that the employee was an independent contractor, if the employer would

avoid liability upon that ground. He must show that he relinquished the right to control the employee's conduct in the manner of doing the work. *Mayberry* v. *[Bon Air] Chemical Co.*, *supra*; *Welch* v. *Reiling et al.*, *supra*; *National Life & Acc. Ins. Co.* v. *Morrison*, 179 Tenn. 29, 162 S. W. (2d) 501; *McVeigh et al.* v. *Brewer*, *supra*; *Ely et al.* v. *Rice Bros. et al.*, *supra*.

■■ "The method by which one is paid is not determinative of whether he is an independent contractor or servant. The fact that Hickman was paid 35c per yard rather than so much per day, did not prevent him from being a servant. *Finley* v. *Keisling*, 151 Tenn. 464, 270 S. W. 629; *Frost* v. *Blue Ridge [Timber] Corporation*, 158 Tenn. 18, 11 S. W. (2d) 860; *Mayberry* v. *[Bon Air] Chemical Co.*, *supra; Income Life Ins. Co.* v. *Mitchell*, 168 Tenn. 471, 476, 79 S. W. (2d) 572, 574.

■ "Nor did the fact of the manner of payment to Hickman, coupled with the fact that he employed plaintiff and the other laborers, prevent them from being servants of defendant, under the circumstances here appearing. It was a reasonable inference that Hickman either had authority from defendant in the first instance to employ these laborers or that, if he had no such authority, defendant later ratified such employment, since it acquiesced in their doing the work and exercised control over the manner of their doing it. In the excellent work, 1 Labatt's Master and Servant, 2d Ed., sec. 32, pp. 102, 103, it is said: 'It is well settled that, where an employee, acting under the express or implied authority of his principal, engages servants to perform work for the benefit of his employer, the principal, and not the employee, is in law the master of the servants so engaged. This doctrine is an obvious and necessary consequence of the fact that, in the case supposed, the power of controlling the

servants, even though it may normally be exercised by the agent after they are hired, really resides in the principal, and may at any time be called into active exercise.' (Citing numerous cases.)

"*Sledge* v. *Hunt*, 157 Tenn. 606, 12 S. W. (2d) 529, is quite in point here. There Hunt employed Jonah P. Sledge to cut timber for him at $1.75 per thousand feet. Jonah P. Sledge furnished his own tools, employed Joseph C. Sledge and others to help do the work, and paid them every two weeks at the rate of $2.50 per day each. Hunt knew of their employment, saw them at work for some months, but never exercised any control over them. Whether he had the right of such control did not appear. Yet it was held that Joseph C. Sledge was a servant of Hunt. That was a workmen's compensation case, but the principle determinating the existence of the relation of master and servant remains the same, whether the consequence be liability in one form or in another. In that case the Court said: ' "A substitute employed by a servant, in accordance with a custom permitting such hiring, or with the implied knowledge of the master or his subsequent ratification, is entitled to the same protection as the servant, and is bound by the terms and conditions of his predecessor's contract, and the fact that the employe receives his own regular wages does not affect the relation of the substitute to the master." ' (157 Tenn. 610, 611, 12 S. W. (2d) 531.)

"So we think that defendant's ground (1) for a directed verdict is not well taken, and that the evidence was such that the jury could reasonably find that defendant was the employer and master of plaintiff.

 "(2) This being so, it owed him the duty to use ordinary care to provide him a safe place to work, including the duty of reasonable inspection. *Mebane* v.

*Baptist Memorial Hospital*, 179 Tenn. 381, 166 S. W. (2d) 622; *Nashville Bridge Co.* v. *Hudgins*, 23 Tenn. App. 677, 137 S. W. (2d) 327; *Pearson Hardwood Flooring Co.* v. *Phillips*, 22 Tenn. App. 206, 120 S. W. (2d) 973.

▮ "Upon the evidence the jury could reasonably find that defendant breached this duty in several particulars and was guilty of negligence which was a proximate cause of plaintiff's injuries. *City of Chattanooga* v. *Powell*, 133 Tenn. 137, 179 S. W. 808; *Grey Eagle Marble Co.* v. *Perry*, 138 Tenn. 231, 197 S. W. 674; *Cincinnati, N. O. & T. P. Ry. Co.* v. *Hall*, 6 [Cir.], 243 F. 76.

▮ "We so held on the former appeal. The evidence now is not materially different on the issue of negligence. The evidence for plaintiff is practically the same, while the evidence adduced by defendant was directed to other questions than that of negligence. Such being the case, our former decision on this question is now binding upon us as the law of the case. *National Life & Acc. Ins. Co.* v. *Morrison*, 179 Tenn. 29, 41, 43, 162 S. W. (2d) 501, 506; *Hunter* v. *Swadley*, 141 Tenn. 156, 163, 207 S. W. 730; *City of Bristol* v. *Bostwick*, 146 Tenn. 205, 240 S. W. 774; *Oliver* v. *State*, 164 Tenn. 555, 51 S. W. (2d) 993.

"In our former opinion Judge BAPTIST pointed out that *Brown* v. *[Chattanooga] Electric Railway Co.*, 101 Tenn. 252, 47 S. W. 415 [70 Am. St. Rep. 666], and other cases sustaining the common law defenses of assumption of the risk, contributory negligence, or the fellow-servant rule, were not here applicable, because defendant, having elected not to operate under the Workmen's Compensation Act, cannot avail itself of these common law defenses. Code sec. 6862.

"(3) Defendant, however, insists that the evidence established without dispute its defense, interposed after the remand, that if it employed plaintiff such employ-

518

ment was 'casual' and not 'in the usual course' of its business under Code sec. 6856(b); that this section excludes the operation of the Workmen's Compensation Act in this case so as to leave open to defendant these common law defenses of assumption of the risk, contributory negligence, and the fellow-servant rule; and that on the authority of *Brown* v. *[Chattanooga] Electric Railway Co., supra, Allen* v. *Chamberlain,* 134 Tenn. 438, 183 S. W. 1034, and like cases, defendant was entitled to a directed verdict on these defenses.

"Code sec. 6856(b) provides that the Act shall not apply to 'any person whose employment at the time of the injury is casual, that is, one who is not employed in the usual course of trade, business, profession, or occupation of the employer.' The test is whether the employee 'is engaged with reference to the usual course of the master's trade, business, etc.' If so engaged, he is within the Act, 'although his employment itself is casual as distinguished from regular employment.' *Gibbons* v. *Roller Estates, Inc.,* 163 Tenn. 373, 376, 43 S. W. (2d) 198, 199. One so engaged is within the Act, though his employment itself is casual and of but a few hours duration. *Parks* v. *[E. M.] Carmell Co.,* 168 Tenn. 385, 391, 79 S. W. (2d) 285, 287; see also *United States Rubber Products Co.* v. *Cannon,* 172 Tenn. 665, 113 S. W. (2d) 1184; *McDonald* v. *Dunn Const. Co., Inc.,* 182 Tenn. 213, 185 S. W. (2d) 517.

"Some cases have held that construction work is not within the usual course of the business of an employer who is not a contractor or a builder. *Murphy* v. *Gaylord,* 160 Tenn. 660, 28 S. W. (2d) 348; *Gibbons* v. *Roller Estates, Inc., supra; Dancy* v. *Abraham Bros. Packing Co.,* 171 Tenn. 311, 102 S. W. (2d) 526; cf. *United States Rubber Products Co.* v. *Cannon, supra.* But an employer's

business may embrace two occupations (*Securities Inv. Co.* v. *Cobb,* 172 Tenn. 418, 113 S. W. (2d) 61; *Anderson* v. *Sanderson,* 25 Tenn. App. 425, 428, 158 S. W. (2d) 374, 375), and one of such occupations may be within and the other without, or both may be within, the Workmen's Compensation Act. *Robinson* v. *Stockley,* 166 Tenn. 380, 383, 61 S. W. (2d) 677; *Hanna et al.* v. *Warren,* 77 Ind. App. 1, 133 N. E. 9; *Peterson* v. *Industrial Comm.,* 315 Ill. 199, 146 N. E. 146; *State ex rel. Lundgren* v. *District of Washington Co.,* 141 Minn. 83, 169 N. W. 488.

■ "The evidence, viewed most favorably to plaintiff, was that defendant, in addition to its other business, was engaged in the business of building houses. One of its corporate purposes was 'building houses.' During 1939 and 1940 it built as many as 100 houses, and had some 15 or 20 in the course of construction when plaintiff was injured. In view of this evidence, certainly it cannot be said as a matter of law that defendant, pursuing one of its corporate purposes and in the course of constructing 100 houses, was not engaged in the business or occupation of building houses. So we think the jury could reasonably find that plaintiff was engaged in the usual course of defendant's business.

■ " (4) We think defendant's claim of judicial estoppel upon plaintiff is without merit. He and several other laborers testified to directions given them by Johnson. On cross-examination of plaintiff it was sought to show that his testimony on this point was contrary to his testimony on the first trial. It does not appear that that testimony was preserved by bill of exceptions. But he was cross-examined upon his cross-examination from the bill of exceptions on the second trial. He explained he had testified four times, did not remember the details of his first testimony, and such variances as there may

have been between it and his present testimony were due to differences in the questions asked him.

▇▇▇ "While judicial estoppel applies where there is no explanation of the previous contradictory sworn statement (*Sartain* v. *Dixie Coal & Iron Co.*, 150 Tenn. 633, 650, 651, 266 S. W. 313), it does not apply where there is an explanation showing such statement was inadvertent, inconsiderate, mistaken, or anything short of a 'wilfully false' statement of fact. *Black Diamond Collieries* v. *Deal*, 150 Tenn. 474, 477, 265 S. W. 985; *Helfer* v. [*Mutual Ben.*] *Health & Acc. Ass'n*, 170 Tenn. 630, 637, 638, 96 S. W. (2d) 1103, 1105, 113 A. L. R. 921, 924, 925.

"The cross-examination of plaintiff did not show as a matter of law that he made any wilfully false statement. At most it merely made his credibility and the truth or falsity of his testimony a matter for the jury. They accredited him and his other witnesses, and it is beyond our province to disturb their verdict in this particular.

▇▇▇ "(5) Defendant complains that one of the jurors was a man whom it had threatened to sue on a·small account some four years before. According to the affidavits on the motion for a new trial, defendant's representatives, Johnson and Smith, on the second day of the trial, noticed that this juror, J. R. Moyers, was of the same name as the man defendant had threatened to sue, and thought he might be the same man; but they waited during the remaining three days of the trial and until after the verdict before they mentioned this matter to defendant's counsel.

"We think this was no ground for a new trial. It is not positively shown that this juror was the same man, and if he were, it is not affirmatively shown that this matter affected the result. Code sec. 10654 forbids us to reverse for any error except upon an affirmative show-

ing that it affected the result of the trial. *Thomason* v. *Trentham*, 178 Tenn. 37, 154 S. W. (2d) 792, 138 A. L. R. 461. See also *Mahon* v. *State*, 127 Tenn. 535, 156 S. W. 458; *Shelton* v. *Hickman*, 26 Tenn. App. 344, 354, 172 S. W. (2d) 9, 13.

"(6) Defendant complains that plaintiff's counsel read from its charter that its authorized capital stock was $450,000. There was, however, no objection to this, and defendant cannot rely on it as error. *Shelton* v. *Martin*, 180 Tenn. 454, 458, 176 S. W. (2d) 247, 248.

"(7) Defendant assigns error upon this part of the charge: 'Even an impeached witness however may tell the truth, and if such witness has told the truth you must weigh the witness' testimony just as you weigh the testimony of other witnesses.' It is said that this led the jury to believe that an impeached witness was entitled to just as much weight as an unimpeached witness.

"This excerpt must, of course, be considered with the other parts of the charge, in which the judge properly instructed the jury in regard to impeached witnesses; and when so considered it was not a prejudicial error.

"(8) Defendant assigns error upon this part of the charge: 'The test is to be found in the fact that the employer has or has not retained power or control or superintendence over the contractor or employee.' The complaint is in the use of the word 'superintendence.'

"Taken in the context of the charge upon the subject, this excerpt, we think, was not reversible error. We think the word 'superintendence,' when taken with the other part of the charge, must have been understood by the jury as synonymous with control. It is not actual control, however, but the right of control as to the details and methods of doing the work, which is the test of the relation of master and servant.

■ "(9) Defendant assigns error upon this portion of the charge: 'Earlier in these instructions I said that the plaintiff's action is based on alleged negligence on the part of the defendant, that it was encumbent upon the plaintiff before any recovery could be had, to prove some actionable negligence on the part of the plaintiff that was the proximate cause of the plaintiff's alleged injuries.' It is said that the use of the word 'plaintiff' was confusing and may have led the jury to believe it was the duty of defendant to show some act of negligence on the part of plaintiff in order for defendant to be absolved from blame.

"The context shows that the use of the word 'plaintiff' here was a mere slip of the tongue, the trial judge inadvertently using 'plaintiff' for 'defendant'; and that it could not have confused or misled the jury, and was not prejudicial error. Cf. *Givens v. State,* 103 Tenn. 648, 662, 55 S. W. 1107.

■ "(10) Defendant's tenth assignment complains of a part of the charge in which the judge submitted to the jury the question whether defendant was building the house, and instructed the jury as to its duties in that event. The criticism is that this charge ignored the defense of casual employment and deprived defendant of this defense.

"Sufficient response to this assignment is that elsewhere in the charge the trial judge properly submitted this defense and correctly instructed the jury in regard to it.

"(11) By its eleventh assignment defendant complains of the portion of the charge in which the trial judge instructed the jury as to the duty of an employer to make reasonable inspection. This part of the charge is sub-

jected to several criticisms, all of which on careful consideration we find to be without merit.

"(12) The twelfth assignment complains of an excerpt from the charge in which the judge submitted in part plaintiff's theory to the jury. The criticism is that this ignored defendant's theory and plea of casual employment. In other parts of the charge, however, this theory and plea were fairly and adequately submitted.

"(13) By assignments thirteen to seventeen, both inclusive, defendant assigns error upon the refusal of the trial judge to charge five of its special requests. We need not quote these requests. By comparison of them with the general charge it will be seen that the matters they presented had already been substantially covered and accurately submitted in the general charge.

"(14) By its eighteenth assignment defendant assigns error upon the refusal of the trial judge to charge its special request No. 14, which was as follows: 'I charge you that if the case is to be dealt with under the common law then the plaintiff himself was guilty of as much negligence as anyone connected with the operation, and such negligence would bar him as a matter of law, from any recovery whatever.'

"It was not error to refuse this request. To have given it would have been an invasion of the province of the jury and equivalent to a peremptory charge that plaintiff was guilty of negligence and such negligence barred him from any recovery. In this connection defendant complains that the trial judge did not explain to the jury the effect of its defense of casual employment and did not instruct the jury as to contributory negligence, assumption of the risk, and the fellow-servant rule. As stated, the judge submitted defendant's theory of casual employment. If defendant thought more ex-

plicit instructions as to contributory negligence, assumption of the risk, and the fellow-servant rule should be given, it should have so requested. Without having done so, it cannot complain. *National Life & Acc. Ins. Co.* v. *Morrison,* 179 Tenn. 29, 50, 162 S. W. (2d) 501, 509; *Long et al.* v. *Tomlin et al.,* 22 Tenn. App. 607, 623, 125 S. W. (2d) 171, 181.

"(15) In its nineteenth assignment defendant complains of the refusal of the trial judge to charge its request No. 16, in which it was sought to have the judge tell the jury that any agreement that defendant should have supervision of the building and say whether the plans and specifications were being carried out would not constitute Blazer an employee of defendant. It was not error to refuse this request because in his general charge the trial judge had fully and fairly submitted to the jury defendant's theory that Blazer was an independent contractor and that it was merely furnishing the materials for the construction.

"(16) Defendant complains of the amount of the verdict. As stated, plaintiff's injuries were broken pelvic bones, ruptured urethra, and injuries to the bladder, genital organs, and abdomen. He was taken to the Knoxville General Hospital and operated on. An incision five or six inches in length was made in the abdomen, the bladder was opened, the blood and urine between the bladder and abdominal wall were drained. The infection caused five or six successive abscesses and for some ten weeks the bladder and the infection had to be drained through tubes. There were five or six operations. Plaintiff was required to lie flat of his back on a steel bed to heal the pelvic bones. Large bedsores developed on his back. He was in the hospital eighty-three days and was taken home in an ambulance. Some weeks later plain-

tiff had to be taken to Fort Sanders Hospital because of the infection that had developed. The scrotum had swollen until it was some eight inches in diameter. He was again operated on and for some time the infection was drained by tubes.

"When injured, plaintiff was thirty, married, in excellent health, and weighed 165 pounds. Following his injuries his weight fell off to 100 pounds, and it was fifteen months before he could walk. The healing of the torn urethra resulted in a scar, which tends to close up, so that a sound has to be passed to open the urethra every so often. These operations are quite painful, and the doctor expressed the opinion that plaintiff would have to undergo them every year or so for the rest of his life. As a result of his injuries he was left weak and very nervous, he incurred more than $1,500 expenses, and suffered total loss of sexual power. One of his hips is higher and one leg shorter than the other.

 "The amount of damages is primarily a question for the jury and their verdict, after it has received the careful scrutiny and approval of the trial judge, is entitled to great weight in this Court. *Phillips* v. *Newport,* 28 Tenn. App. 187, 187 S. W. (2d) 965, 973, and cases there cited. Upon full consideration we think the verdict is not so excessive as to justify us in disturbing it. Cf. *City of Nashville* v. *Brown,* 25 Tenn. App. 340, 349, 350, 157 S. W. (2d) 612, 618, 619; *National Life & Acc. Ins. Co.* v. *Morrison,* 179 Tenn. 29, 53, 162 S. W. (2d) 501, 510.''

 In the course of plaintiff's attorney's argument before us, he alluded to a pencil notation that had been made in the margin of defendant's printed brief at page 83. This note was apparently a query rising in the mind of some unknown reader who misconstrued the obvious

purpose of defendant's assignment of error No. 4, which appeared on that page of the brief. We think this comment was immaterial and merits no detailed consideration. To dispose of the matter we need only to say that the notation is not properly before us, and is not considered by the Court in its decision of the case.

All assignments of error are overruled and the judgment is affirmed.

Burnett, J., not participating.