PARKS *v.* E. M. CARMELL Co. *et al.*

*(Nashville,* December Term, 1934.)

Opinion filed February 23, 1935.

WALKER & HOOKER, of Nashville, for plaintiff in error.

CORNELIUS, MCKINNEY & GILBERT, of Nashville for defendants in error.

MR. SPECIAL JUSTICE EDWARD J. SMITH delivered the opinion of the Court.

Claiming that he lost a thumb as an employee of E. M. Carmell Company, Parks filed a petition under the Workmen's Compensation Act (Code 1932, section 6851 et seq.) against the employer and its insurance carrier.

The undisputed facts are that E. M. Carmell Company was the subcontractor for installing the plumbing and steam heating in the new post office building at Nashville. T. M. Lester, who operated a trucking company in Nashville, had been employed by the company to deliver plumbing and steam heating materials and equipment, including two boilers, from the railroad yards to the post office site.

As the employees of Lester were not members of a labor union, and as the general contract, awarded to Messer & Sons, provided that only union labor could be employed on the work, a protest was made against Lester's men being allowed to do the work for which they had been employed by the company.

Kleuver, the labor representative of the structural ironworkers, insisted that the removal of the boilers from Lester's truck, and placing them in position for installation by the steam fitters, was work properly to be done by structural ironworkers. Foley, the labor representative of the steam fitters, insisted that the work was of a kind that should be done by the steam fitters.

Being unable to settle the controversy, the matter was taken for adjustment to Mr. Willing, who was the superintendent of the general contractors, Messer & Sons. Willing ruled that Lester's men, being nonunion men, could not be employed to do this work, and that structural ironworkers, and not steam fitters, were the proper men to do it. Willing further ruled that, if the superintendent of E. M. Carmell Company did not use structural ironworkers for the purpose of removing the boilers from Lester's truck and putting them in position to be installed by the steam fitters, he would charge E. M. Carmell Company with the amount that the structural ironworkers would have earned if they had been allowed to do the work.

Over the protest of Foley, Couch, the superintendent of E. M. Carmell Company, employed Kleuver, and three or four other men, one of whom was Parks, to remove the boilers from Lester's truck and place them in a position in the building where the steam fitters could connect them.

The proof shows that Parks was a structural ironworker, and had, for some weeks, been employed by

Crawford Weigle Company as such. Parks and the other structural ironworkers employed to do the work were directly employed by Couch, and were paid by him at a stated price per hour. It was estimated that the time required for removing the boilers and putting them in place for the steam fitters would require about a week; as a matter of fact, it required a week and fourteen hours.

On October 30, 1933, after he had been working but several hours, Parks' thumb was crushed by being caught by a cable winding off a drum, and at a time when he and his coemployees were raising the boiler from Lester's truck which was rigged with Lester's equipment. Parks had never worked in any capacity for E. M. Carmell Company before or after October 30, 1933.

The proof shows that moving plumbing and heating equipment from depots to the place where such articles are to be installed is a part of the regular course of business of plumbing and steam heating contractors; that in some places this work is handled by ironworkers, and in others by steam fitters, and that the question of which class of men will do the work depends on the locality in which it is done and the terms of the contract; that, if union labor is strong in a certain locality, and the contract provides for the employment of union labor only, such work is done by structural ironworkers.

In most instances, however, work of the kind Parks was engaged in is done by ironworkers, as they are better riggers than are steam fitters.

It is true that E. M. Carmell Company had employed Lester to do the work, but the fact that he was barred from its performance, and the work ordered to be done by structural ironworkers, can in no manner be attributed to Parks, for he was employed by Couch, superintendent of E. M. Carmell Company, and was doing work which

Couch testified was of the character required to be done in the ordinary and regular course of the business of plumbing and steam fitting, in which E. M. Carmell Company was engaged.

The defendants insist that, at the time Parks received the injury complained of, he was a temporary or emergency employee, that under the contract of employment he had no reasonable ground to expect that he would be called on by the employer to do any further work, and consequently he was a casual employee as defined by section 6856 (b) of the Code.

The trial judge held that Parks had never been regularly in the service of E. M. Carmell Company as an employee, as defined by section 6852 (b), but was merely temporarily employed in an emergency with no thought of engaging regularly in the employ of the company, and was therefore a casual employee, as defined by section 6856 (b).

Accordingly, the petition was dismissed.

The sole question presented for decision is whether the trial judge correctly construed section 6856 (b).

Evidently the trial judge construed section 6852 (b), which defines "employee," *in pari materia* with section 6856 (b), which defines "casual employees." In other words, it was his opinion that section 6856 (b), which provides: "Any person whose employment at the time of injury is casual, that is, one who is not employed in the usual course of trade, business, profession, or occupation, of the employer," should be construed in connection with section 6852 (b), which provides: " 'Employee' shall include every person, including a minor, in the service of an employer, as 'employer' is defined in paragraph (a) above, under any contract of hire, apprenticeship, writ-

ten or implied. Any reference herein to an employee who has been injured shall, when the employee is dead, also include his legal representatives, dependents and other persons to whom compensation may be payable under this chapter.''

If this construction of section 6856 (b) is to be upheld, it will be necessary for the court to reform the definition furnished by the statute and cause the section, as reformed, to read: ''Any person whose employment at the time of the injury is casual, that is, one whose employment is casual, or is not in the usual course of trade, business, occupation, or profession of the employer.''

Such a construction would prescribe a biform test of casual employment, and perforce would destroy the unitary test prescribed by the statute.

It has been held in many cases construing workmen's compensation acts, the exclusion clauses of which provide, ''whose employment is casual or not in the regular course of the business, trade, occupation or profession of the employer,'' and the object is to show a case without the purview of the act, the question of the casualness of the employment is not presented in a case after it has been determined that the employment is not in the usual course of the employer's trade or business, since proof of either of the requirements will make out the case without the purview of the act; while, conversely, if the object is to show a case within the purview of the act, proof that the employment is within the course of the employer's business will not exclude the necessity of a consideration of the question of the casualness of the employment. 60 A. L. R., 1196, annotation.

As stated above, the trial judge considered that an employee should be denied compensation if his employ-

ment was casual from the viewpoint of the character and nature of the contract of employment, even though the injury was received in the course of the regular trade or occupation of the employer.

■ ■ This conclusion cannot be reconciled with the principle announced in *Gibbons* v. *Roller Estates, Inc.*, 163 Tenn., 373, 376, 43 S. W. (2d), 198, 199. In that case, as well as in *Murphy* v. *Gaylord*, 160 Tenn., 660, 28 S. W. (2d), 348, compensation was denied on the ground that the injury was suffered in an employment which was not a part of the regular business of the employer, but was collateral and incidental thereto. It seems obvious that the test of casual employment, as defined by section 6856 (b), is unitary and exclusive. Such was the conclusion reached in *Gibbons* v. *Roller Estates, Inc., supra,* wherein Mr Chief Justice GREEN said: ''Casual employment appears to be defined by our statute. The statute excepts 'any person whose employment . . . is casual, that is, one who is not employed in the usual course of trade, business,' etc. Unless, therefore, an employee is engaged with reference to the usual course of the master's trade, business, etc., he must be regarded as a casual employee, not within the protection of the statute. Conversely an employee may be within the protection of the statute, if engaged with reference to the usual course of the master's trade, business, etc., although his employment itself is casual as distinguished from regular employment.''

The language quoted is not to be regarded merely as a *dictum,* but as the considered and authoritative definition, exclusive and inclusive, of what constitutes casual employment under the Tennessee act.

█ Section 6901, Code of 1932, provides that the Workmen's Compensation Act shall be construed liberally by the courts to the end that the objects and purposes of the statute may be realized and attained. This court in dealing with questions involving the application of the statute uniformly has adhered to the principle of liberal construction, and in doubtful cases has held the act applicable and the employee entitled to compensation.

In *Baxter* v. *Jordan*, 158 Tenn., 471, 475, 14 S. W. (2d), 717, 718, it was said: "This court has never been unmindful of the remedial nature of this legislation, as its repeated decisions will disclose, and the act has been uniformly construed so as to secure for the beneficiaries of the act every protection a liberal construction authorized."

It results that the judgment must be reversed, and judgment entered here in favor of Parks, for 60 weeks at $16 per week, or, in all, $960, with interest from the date of the entry of the judgment in the court below. The defendants in error will pay the costs.