McDonald *v.* Dunn Const. Co., Inc., *et al.*

(*Jackson*, April Term, 1944.)

Opinion filed February 3, 1945.

214

JAMES L. ROULHAC and E. F. MCCLURE, both of Memphis, for plaintiffs in error.

CHARLES L. NEELY and O. W. WELLS, both of Memphis, for defendants in error.

MR. JUSTICE GAILOR delivered the opinion of the Court.

Plaintiff, Mrs. Robert Emmit McDonald, filed suit in the Circuit Court of Shelby County against the defendants, Dunn Construction Company and Polk Smartt, for the wrongful death of her husband who was employed by the defendants as a civilian guard on construction work in which defendants were engaged as contractors with the United States Navy at the Millington Air Base in Shelby County, Tennessee. The original declaration based defendants' liability on common law negligence, alleging that at the time he met his death, McDonald was a "casual employee" within the meaning of Code, sec. 6856(b). When this declaration was met by a plea in abatement plaintiff amended her declaration to allege an alternative ground of liability which was—that at the time of his death McDonald was an employee of the United States Navy by reason of the contract of the Navy and the defendants, under a term of which the Navy had reserved the right to control the civilian guards employed by defendants.

Having heard all the evidence, the trial court granted motion for peremptory instruction, finding that at the time of his death McDonald was not a "casual employee", and that he was in the employ of the defendants at the time, and not in the employ of the United States Navy. On appeal to the Court of Appeals this judgment was affirmed by a divided Court, we granted *certiorari*, have heard argument and the case is now before us for disposition.

The acquisition, construction and completion of the Air Base at Millington can only be characterized as a "vast" or "tremendous" war project. The defendants were responsible for the entire construction and all its incidents. At times they had between 8,000 and 10,000 employees on the project and as many as 500 civilian

guards. These guards were under the immediate command or direction of a civilian chief or foreman. They were worked in squads and had various duties. They guarded equipment, patroled the grounds, prevented and put out fires, and also saw that no one entered or left the grounds who was not properly accredited either by the Navy or the contractor. Early in the progress of construction, the hundreds of acres of ground involved in the project were surrounded by a wire fence. There were several gates or openings in this fence. The gate where the accident here happened was not the main gate but was an auxiliary gate called the Airplane Gate, and as its name implies, was wide enough to admit airplanes, as well as equipment and personnel. The opening in the fence for this purpose was 100 feet wide. To close this opening, two gates were installed which operated laterally on rollers on a concrete base or track. When closed, these gates met in the middle and each closed an opening 50 feet wide. Each of the gates was at least 57 feet long, so that when pulled out to close the opening, there were 7 feet of each gate within the support of two posts of heavy pipe, so erected as to prevent the gates from toppling. There were four of these pipe posts, two at each edge of the opening in the fence. There is some dispute as to whether there was furnished by the manufacturer a device for preventing the gates from running out of the sheath of the posts, but viewing the evidence as we must, in the light most favorable to the Plaintiff, it appears that some such device was furnished by the manufacturer but was not installed at the time of the accident.

Each of the two gates was constructed of heavy metal and wire and weighed by various estimates, from 1,500 to 2,000 pounds.

The passage through the gates of bull-dozers and other such equipment of the contractors threw gravel on the concrete runway from time to time, and made the gates difficult to close and open, so that considerable force was necessary for the operation of the gates, and so that the obstructing gravel sometimes caused the rollers under the gates to leave the concrete track or runway. At the time of the accident the Air Base was still but partially completed and it does not appear from the record that any airplanes were at the Base or had used these gates.

The accident happened about 5:30 p. m. February 14, 1943. At that time, McDonald had been in the employ of the defendants since November, 1942, as a civilian guard who had nothing whatever to do with construction work. As such guard he had performed various duties and he had been stationed at the gate in question since February 1, 1943, or about 13 days. The undisputed account of how the accident occurred is this: At the close of his day's work, Taylor, another employee of the defendants, who was the operator of a bull-dozer, was taking his machine to the shop for repairs, and had to pass through the gate for this purpose. When he arrived at the gate, McDonald was not available, or in any event did not open the gate, but Taylor, himself, opened it and drove his machine through it. McDonald, however, undertook to close the gate and had some difficulty in making it run on its tracks. He sought and obtained Taylor's assistance in this operation. While Taylor was undertaking to clear the track or to get the rollers of the gate back on it, McDonald pulled the gate out of the protecting sheath of the posts, it toppled over, crushing his head and fatally injuring him.

The two questions presented by the appeal are: (1) Was McDonald, at the time he met his death, a "casual

employee" as that term is defined in our Workmen's Compensation Act, Code, sec. 6856(b), or in the alternative, (2) Was he, at the time, an employee of and under the control of the United States Navy and not of the defendants?

The judges below have been of the unanimous opinion that McDonald was not a "casual employee" within the meaning of the foregoing section of the Code as it has been construed in a number of our cases. For example, *Murphy* v. *Gaylord*, 160 Tenn. 660, 28 S. W. (2d) 348; *Gibbons* v. *Roller Estates, Inc.*, 163 Tenn. 373, 43 S. W. (2d) 198; *Parks* v. *E. M. Carmell Co.*, 168 Tenn. 385, 79 S. W. (2d) 285; *United States Rubber Products Co.* v. *Cannon*, 172 Tenn. 665, 113 S. W. (2d) 1184.

██ Moose, the general superintendent of the defendants, whose testimony is not disputed or controverted, testified that defendants employed guards or watchmen on all their projects whether private or governmental, and that the only difference between the employment of guards on government contracts, of which these defendants had had three, was that on the latter, the guards were in uniform. As stated, McDonald had, at the time of the accident, been in the employ of the defendants since the preceding November, a period of about three months, and he had been a guard on the gate where the accident happened for about two weeks, or since February 1st. From these undisputed facts there can be but one conclusion, and as stated, it was reached by all the judges below, namely, that McDonald was not, at the time of the accident, a "casual employee", but was employed "in the usual course of trade, business, profession, or occupation", Code, sec. 6856(b), of defendants.

As to the second question,—whether McDonald was, at the time of his death, an employee and under the control of the United States Navy, the essential facts are also undisputed. The only proof introduced by plaintiff to support this theory is that certain orders by the Naval Commanding Officer with regard to the use of this particular gate by Navy personnel were posted in the guardhouse, and that these orders were known to the guards and obeyed by them. A fair construction of this fact is that these orders were issued to control the Navy personnel rather than the guards. Although a recognition of the order by the guards was a recognition of the right of the Naval Commanding Officer to say who should and who should not enter and leave the Base. There is the evidence of the civilian chief or foreman of the guards that the Navy had its own guards for the protection of its equipment, and for other purposes, and that the Naval officers exercised no immediate control over the civilian guards except by the orders posted in the guardhouse with regard to use of this auxiliary gate by Navy personnel.

It is manifest that the control which in its contract with the defendants, the Navy reserved over these civilian guards, was a control only for the purpose of seeing to it that the guards should be men of desirable character and reputation, and should continue as such during the period of their employment by the defendants on the Base. It was essential, of course, that the guards should be men of some discretion and at all costs, sabotage and other subversive activities were to be avoided. Neither the language of the contract nor the action of the parties under it lends color to the theory that the Navy "controlled" these employees of the defendants in the sense that the term is used in the law of master and servant.

These guards were paid by the defendants and the defendants carried their social security and old age benefits.

"In *Employers' Liability Assurance Corporation* v. *Warren,* 172 Tenn. 403, 112 S. W. (2d) 837, it was held that where an employer carries Workmen's Compensation Insurance and the earnings of the employee are included in computing premiums paid for such insurance, neither the employer nor the insurer is in position to question the relationship of the parties under the Compensation Law." *Carter* v. *Hodges,* 175 Tenn. 96, 101, 132 S. W. (2d) 211, 213.

The defendants and their foremen worked these guards in squads and shifted them from one employment to another every thirty days. In the phase of the question presented by the facts immediately surrounding the accident, equipment of the defendants was being moved through the gate and another of defendants' employees was assisting McDonald in closing the gate when the latter was killed. It was admitted at the time of the argument here, that it was the defendants' duty, not the Navy's, to instruct McDonald as to his duties and as to the method of opening and closing the gate, which was a part of the incomplete project which had not been finally accepted by the Navy. The right to control the "result" is not determinative of the existence of the relation of master and servant, but the actual control of means and method is. *Texas Co.* v. *Bryant, Com'r,* 178 Tenn. 1, 152 S. W. (2d) 627; *Phillips* v. *Tennessee Eastman Corp.,* 160 Tenn. 538, 26 S. W. (2d) 1051.

At law, the well known test of the existence of the relationship of master and servant is whether the employer has the right or duty of directing the employee as to the details of his employment and when, as here,

the question is in an action for negligent injury, the test of the employer's liability is whether it was his duty to instruct and direct the servant in the details of the particular "means" or "method" of employment, out of which the injury arose. *Texas Co. v. Bryant, Com'r,* 178 Tenn. 1, 152 S. W. (2d) 627. This Court has applied this principle, which is universally accepted, to the settlement of questions involving "loaned servants" in a number of cases.

"There is no conflict in the evidence as to where the authority lay to direct the specific act which caused the injury to the plaintiff in the case before us." *Gaston v. Sharpe,* 179 Tenn. 609, 614, 168 S. W. (2d) 784, 786.

The statement of the question "on whose work was the employee engaged" at the time of the accident, is but another way of saying, "which employer had the right to direct the details of the work," and if the determination of this question is not conclusive of liability as between the employers, it is at least a most important factor. *Gaston v. Sharpe, supra.* The question is discussed at length with the citation of a wealth of authorities in *Owen v. St. Louis Spring Co.,* 175 Tenn. 543, 136 S. W. (2d) 498.

The rule that this Court has approved, making the test the right to control at the time and in the details of the means and method of employment in which the accident arose, is generally accepted. Horovitz's Workmen's Compensation, p. 236; Schneider's Workmen's Compensation, (2 Ed.), Vol. 1, p. 213; Perm. Ed., Vol. 3, p. 3.

We think, in the case before us, that the facts are clear and not to be convincingly contradicted, that at the time of the accident, McDonald was engaged in the employment of the defendants about their business. They had the right and did exercise the control of the details of the operation out of which the accident arose.

Considering the dissenting opinion of the Court of Appeals, we quote from page 1:

"For the purposes of this case I am content to proceed upon the assumption that theoretically the deceased was in the general employ of the contractor."

■ This admission necessitates the further admission that the contract of employment between McDonald and the defendants was still in force at the time of the accident. Since defendants had complied with all requirements of our Workmen's Compensation Law, and were proceeding under it, that law was an essential element and condition of the contract of employment. *Scott* v. *Nashville Bridge Co.*, 143 Tenn. 86, 223 S. W. 844; *Kennedy* v. *Columbian Cas. Co.*, 163 Tenn. 312, 43 S. W. (2d) 201; *Tidwell* v. *Chattanooga Boiler & Tank Co.*, 163 Tenn. 420, 43 S. W. (2d) 221.

■ If an employer has complied with the provisions of the Workmen's Compensation Act, he is not subject to suit for negligence at common law, since the Act provides remedies which are exclusive.

"The rights and remedies herein granted to an employee subject to this chapter on account of personal injury or death by accident shall exclude all other rights and remedies of such employee, his personal representative, dependents, or next of kin, at common law or otherwise, on account of such injury or death." Code, sec. 6859; *Copeland* v. *Cherry et al.*, 20 Tenn. App. 122, 129, 130, 95 S. W. (2d) 1275.

Since defendants admit liability under the Workmen's Compensation Act, our decision of the case achieves the same result.

It results that the assignments of error which we have considered in the course of the opinion are overruled and the judgment is affirmed.