J. T. Chapman

*v.*

Clement Brothers, Inc.

435 S.W.2d 117.

(*Knoxville,* September Term, 1968.)

Opinion filed November 22, 1968.

JAMES E. FOGLESONG and H. THOMAS PARSONS, Knoxville, of counsel; POORE, COX, BAKER, McAULEY, RAY & BYRNE, Knoxville, for appellant.

LEE ASBURY and ROY ASBURY, Jacksboro, for appellee.

MR. CHIEF JUSTICE BURNETT delivered the opinion of the Court.

This is a Workmen's Compensation case. The only question for determination is whether or not the injury was a scheduled injury or was an injury to the body as a whole. The Chancellor determined that the latter applied and consequently the employer and insurance carrier have appealed, assigned error, argued the matter and filed excellent briefs. We, after reading these and making an independent research of the matter, have now arrived at a conclusion.

The injury to the petitioner took place on September 22, 1965. He was immediately brought to Knoxville to an orthopedic surgeon, who states:

"This patient gave a history of having jumped from a heavy piece of earth moving machinery which was

running off the road when the steering gear locked while working on the highway Interstate 75 for the Clement Brothers of Caryville, Tennessee. He states when he jumped from this machine he fell forward on the right shoulder sustaining injuries to his forehead and nose and right shoulder. At that time the physical examination showed a well nourished and developed 40-year old white male with accute pain and distress in the right shoulder. There was no deformity. There were abrasions and contusions of the forehead and nose, but no deformity of these parts. Examination of the cranial nerves showed these nerves to be intact. There was marked pain, tenderness and spasm about the right shoulder joint with marked limitation of motion due to pain. There was no neurological or circulatory loss in the right upper extremity, by that I mean that the circulation was satisfactory and he was able to feel and move the portions of the right upper extremity. The patient does not have pain or injury or deformity in other areas of the body. At that time x-ray examination was carried out of the right shoulder which showed a fracture of the upper portion of the humerus, which is the upper arm bone. There was a large flake of bone separated about a half an inch from the remaining portion of bone. There was no dislocation of the shoulder joint. Diagnosis at that time was made of a fracture of the greater tuberosity of the right humerus and possibly a tear of the rotator cuff of the right shoulder. The rotator cuff are the muscles which extend to the upper arm from the shoulder blade. This cuff of muscles and tendons is called the rotator cuff. The patient was then admitted to the hospital for further care."

The doctor then goes on to testify concerning the treatment given this man and states that an operation was necessary and after this was done he was allowed to go home and directed to take certain exercises and do certain things but he felt that the man had not done all that he was told to do. He did come back a number of times for additional treatment. The torn muscles were partially attached to the big piece of bone that was pulled off and were sewed back with a wire loop and placed around the flake of this bone. The doctor told how this was held together and put on. This doctor then concludes:

"Other than that that I noted at the original injury. In other words, no deformity, no definite pain in the other areas of his body on the original examination. He did have abrasions and contusions, this is a skinned place and a bruise, of his nose and forehead, but he had no deformity of any of these parts. There was marked pain and spasm about the right shoulder. There was no pain or deformity or injury about the other areas of the body on the original examination."

The doctor says that this was an injury to the shoulder joint and that this joint is made up as a portion of the upper extremity, and he then says that The American Medical Association Guide sets forth that "The upper extremity is a unit of the whole man. It may be divided into four sections; the hand, the wrist, the elbow and the shoulder." In other words, this was an injury to the shoulder which is a portion of the right upper extremity. This doctor then says that this injury is restricted to this right upper extremity and the use of all parts attached to his shoulder, arm, forearm and hand would be impaired quite markedly due to the restriction of motion that he has in his shoulder due to pain, which the doctor

is sure he has. The doctor fixes the disability to the entire right upper extremity.

About fifteen months after this accident the petitioner, employee, was taken to another doctor at Oak Ridge, who was selected by his lawyer. This doctor saw the man some fifteen months after the accident, and he said this:

"We found a well healed scar across the top of his right shoulder. There was gross atrophy of the major part of the muscles about the shoulder, including the teres muscles, the supraspinatus muscles and the deltoid. Atrophy means springing away or wasting away. In other words, his right shoulder is skinny. The bones show through more than it does on the normal left shoulder that was not injured. You can just look at his shoulder and see the difference. I think I can explain why this has happened a little bit later."

The doctor goes on and describes the nature of this injury and the operation which it looked as though had been performed on him and tells what he can do with this arm in the condition it is in at the time he saw the man. And then he says this:

"Now, in summary, here we have a man with obvious atrophy about his shoulder. I think it is due to disuse. There is no nerve injured in the neck, or any nerve injury that would cause him to be denervated or atrophy because of polio or spinal cord injury, or anything like this. I said I would discuss atrophies. The man has not used his arm, so he has lost the use of it. The muscles have wasted away to nothing. He is left with a skinny shoulder due to atropied muscles. He has a loss of motion. As you would palpate across his

shoulder, the joint was quite painful. To lay your hand on his shoulder would reproduce his pain.''

This doctor also says:

''Medically speaking, the shoulder girdle is included as a part of the arm. So, that would be everything outside of the rib cage. That would be the shoulder blade, and all the muscles that attach thereto, down to the arm. * * *

''Yes. As of the amount on December 5 and 6, that I saw this man, I would estimate seventy five to eighty percent permanent—Excuse me. Seventy five to eighty percent temporary total disability to his arm. Well, let me put it another way. As of right now, the man's arm is useless to him. So temporarily, it is one hundred percent disabled. He can't use it for anything other than just a few isolated movements, like buttoning his pants, or buttoning some buttons, or buckling a belt. He could not wash his face, he could not brush his hair, he could not brush his teeth, or take care of any of his body needs. To all intents and purposes today, he has no value of the arm. But I am not convinced this is permanent, having only seen him the one time, and seeing the calcium deposit about the x-rays, I feel that the arm can be rehabilitated to a point of permanent disability something under this.''

And then the doctor further says, which we feel is pertinent in deciding a lawsuit of this kind:

''I would equate it to something like thirty to thirty five percent of the body as a whole for this reason, even though it is just a quarter member of the four extremities, it is his dominant hand. He is right

handed, and many of the bodily functions require the use of two hands. Thereby taking away one, you have done more than take just one fourth of his capabilities away. So, as a medical judgment, I would say something between thirty and thirty five percent of his body as a whole."

Finally this doctor, that is the doctor selected by the employee, is asked:

"Q Now, as far as his disability is concerned, and I am referring to the visual disability, and from all we know about him, and based upon x-rays and based upon a reasonable degree of medical certainty, don't you find, as a matter of fact, that his disability is confined to the arm?

"A The actual disability is to the right upper extremity.

"Q And confined there, isn't it, Doctor?

"A The disability of the member, yes—It is not confined there when you relate it to body function."

This same doctor says: "I understand what you mean. They have not—that is, not directly affected any other part of his body, you are right." The medical testimony of these two doctors, one treating him immediately after the injury and then his own doctor who saw him and evaluated this injury some fifteen months later, reached the conclusion that his injury was one purely to this right arm, and the only way this could affect the body as a whole would be because the arm was not in use. In other words, there were no other injuries to any other part of the body. The trial judge though heard the man talk about how he suffered, etc., and decided that the injury ex-

tended to the body as a whole. After carefully reading this testimony we must, and do, definitely disagree with this conclusion.

■ It is apparent from reading the memorandum of the Chancellor and the argument of counsel for petitioner that they disagree with our holding in *Shores v. Shores,* 217 Tenn. 96, 395 S.W.2d 388, that if there is an injury to a specified member under the act and not to any other part of the body then the compensation awarded for the injury to such scheduled member is binding. In this case we set forth many cases which had been tried over the years wherein when the proof showed that there was an injury to the body as a whole then there was no limitation on a scheduled member beginning with *Russell v. Virginia Bridge and Iron Co.,* 172 Tenn. 268, 111 S.W.2d 1027, and many others. Counsel argues that the *Russell* case and those following are still the law in this State. However, the counsel and Chancellor fail to realize that after the trial of cases of this kind under the latter paragraph of Section 50-1007, T.C.A., it was frequently found that the person was suffering from a scheduled injury, and the court was allowed to fix injury to the body as a whole, but the Legislature in 1966 added this to the end of that Code Section (T.C.A. 50-1007(c)):

"The benefits provided by this paragraph shall not be awarded in any case where benefits for a specific loss is otherwise provided in this title."

■ As we said in the *Shores* case, it is well known the Compensation Act is purely a creature of the Legislature and when it provides that such a thing shall be compensated a certain amount, then the courts have no right to legislate otherwise. We must award what the Legisla-

ture says is the compensation to be allowed for such an injury.

T.C.A. 50-1007 is titled, "Schedule of compensation—Specific indemnities for certain injuries—Pay for concurrent injuries—Permanent partial disability." Under sub-section (c), Permanent Partial Disability, is a long list showing what is given for these scheduled injuries, setting out the percentage of injury for the loss of part of a finger, an arm, a hand, etc., and "For the loss of an arm sixty-five percent (65%) of the average weekly wages during two hundred (200) weeks." There is no doubt that the Legislature has tried in their judgment to fix what should be indemnity for the physical or functional loss of one member even though there is no loss of earning power or wages without regard to the extent of disability suffered.

This question was very ably discussed by Larson in his work on Workmen's Compensation, particularly beginning at Section 58.20, page 44, under the heading, "Exclusiveness of scheduled allowances" and he begins his discussion of this subject thus:

"The most important question of general applicability in this area is the extent to which schedule allowances should be deemed exclusive."

In the notes and cases carried down to date in the Supplement to this work there are literally dozens upon dozens of cases cited. We in our investigation of the present case have read many of them. After discussing the question and the position the courts have taken with reference thereto the author says this:

'The usual statute provides for both total disability and specific loss of a leg, without expressly saying that

232

either should be exclusive." (Citing the note 43, which is) "When statutes expressly provide that schedule payments, when applicable, are exclusive or are in lieu of all other benefits, the question here discussed cannot arise in the courts."

In other words he is discussing the statute without that exception which is now in our statute and what the courts did in this State and others when the loss of a member extended to other parts of the body and interfered with their efficiency. The courts made allowance for this and held that the amount fixed for the scheduled member was not exclusive and this was done in this State up until 1963 when the Legislature provided that scheduled benefits are exclusive. This being true there is nothing that the court has any right to do when the facts show, as they do here that this was a scheduled injury— this was purely a medical question as to what part of the body was injured, which was the right extremity—there is nothing that we under the Act as it now exists can do except allow the disability for the scheduled member as this was the only thing that was injured. The statute relating to scheduled benefits has arbitrarily fixed the amount of compensation to be paid.

What we said in the *Shores* case, supra, is amplified again by the factual situation in this case, and we cannot improve on what we said in the *Shores* case. It is argued herein that we in *F. Perlman & Co. v. Ellis*, 219 Tenn. 373, 410 S.W.2d 166, held contrary to the *Shores* case. A careful reading of this case will show that this is incorrect because in the *Perlman* case in addition to the scheduled injury Ellis suffered speech impairment, loss of hearing and other disabilities to the body as a whole.

It is also argued that we disagreed with the *Shores* case in *Federated Mutual Imp. & Hard. Ins. Co. v. Cameron,* 220 Tenn. 636, 422 S.W.2d 427, but this argument is incorrect because it was specifically held in that case that Cameron "could, and probably did, suffer injury to his back, distinct and separate from any impairment of his back as a result of his leg." In this case it was also recognized that in *Perlman,* supra, there were other injuries than scheduled injuries as shown in the body of the opinion. In neither of these cases did we in any wise overrule what was said in *Shores,* supra, and we specifically recognized the rule as set forth in *Shores.*

The Commercial Clearing House, Inc., in its work on Compensation lists a case from the Eastern Division, United States District Court of *Cummings v. Royal Indemnity Co.,* D.C., 264 F.Supp. 189, decided on January 17, 1967. In this opinion applicability of the *Shores* opinion was raised and this opinion holds that the man in that case sustained a multiple comminuted fracture of the bones of his left arm which resulted in four operations, as well as injuries to his ankle, to his left side and to his left shoulder. The court was of the opinion that thus the man was entitled to be compensated for injuries to the body as a whole. This is an entirely different proposition from that we have before us now and is easily distinguishable.

In view of our interpretation of the 1963 amendment to T.C.A. 50-1007, under the proof herein, and the finding of Dr. Tittle that his disability is from seventy-five to one hundred percent for the loss of use of the arm and the statute fixes the scheduled amount of time for the loss of use of an arm at sixty-five percent of average weekly wages for two hundred weeks, the recovery in this case is

limited to one hundred percent for the loss of use of an arm. An order may be thus drawn.

It results that the Chancellor's decree is reversed and the case remanded for compliance with this opinion.