Margaret WADE, Plaintiff-Appellee,

v.

**AETNA CASUALTY AND SURETY COMPANY, Defendant-Appellant.**

Supreme Court of Tennessee,
at Nashville.

July 27, 1987.

Thomas L. Reed, Jr., Reed, Rogers & Trail, Murfreesboro, for plaintiff-appellee.

William C. Moody, Michael M. Castellarin, Nashville, for defendant-appellant.

## OPINION

FONES, Justice.

The issues in this workers' compensation case involve the amount of recovery due for claimant's work-related injuries.

On 19 June 1984, claimant suffered an accident while performing her duties as a nurses' assistant at the Middle Tennessee Medical Center [MTMC]. After diagnosing claimant's injury as a musculoligamentous strain of the spine, claimant's initial treating physician, Dr. Lowery, prescribed anti-inflammatory medications and flexion exercises with intermittent bed rest. Despite

returning to work on 8 October 1984, claimant continued to experience pain.

On 20 December 1984, claimant visited Dr. Lowery and complained primarily of pain in her left knee, an injury which claimant related back to her work-related accident on 19 June. No longer capable of working, claimant sought the opinion of an orthopedic surgeon, Dr. O. Tom Johns, concerning her continued back and knee pain. On 5 February 1985, Dr. Johns performed surgery on claimant's left knee, but a planned myleogram on her back was foregone so as to avoid a possible allergic reaction.

Despite the apparent success of the knee operation and the lack of any objectively measurable organic deficiencies in claimant's back, she continued to complain of pain. On 16 July 1985, Dr. Johns referred claimant to the Nashville Pain and Stress Clinic for psychological evaluation concerning her laments about pain. Following a series of psychological tests, claimant was diagnosed as suffering from psychogenic pain disorder, a malady in which pain is the primary symptom and is inconsistent with organic findings,[1] with underlying depression. On 16 September 1985, claimant entered the Stress Clinic's chronic pain program, an intensive four week group treatment program designed to teach participants how to cope with their pain. Following completion of this program, claimant returned to her position at MTMC but was subsequently fired in late March of 1986.

Claimant filed suit against MTMC's workers' compensation insurance carrier on 5 April 1985 seeking recovery of benefits allegedly due because of the injuries to her back and knee.[2] After a hearing on 18 November 1986 in the Chancery Court for Rutherford County, the chancellor held that claimant successfully proved that her back and left knee injuries resulted from a work-related accident at MTMC. The chancellor held that claimant was entitled to permanent partial disability to twenty-five percent of the body as a whole, as well as twenty-three weeks of temporary total disability. Furthermore, the chancellor held that defendant was responsible for several outstanding medical expenses, including the costs of claimant's treatment at Nashville Pain and Stress Clinic.

Defendant first challenges the award of permanent partial disability to twenty-five percent of claimant's body as a whole.

Dr. Johns testified that, although he was unable to discern any permanent disability with respect to claimant's back, she retained a fifteen percent permanent partial impairment to the "left lower extremity as a whole." In awarding permanent partial disability, the chancellor stated that "I think including the fifteen percent limitation, permanent partial limitation of the knee, including that and the psychogenic pain, that she should have twenty-five percent permanent partial disability to the body as a whole."

■ Defendant maintains that the permanent disability to claimant's "left lower extremity as a whole" is in fact an injury to her left leg, which is a so-called "scheduled member." Defendant therefore argues that any award of permanent disability for

---

1. Dr. Bronwen Williams, a licensed clinical psychologist and staff member at the Nashville Pain and Stress Clinic, defined psychogenic pain disorder as

  [a] disorder in which pain is the predominant symptoms [sic] and that pain is inconsistent with the organic findings and by that, there may be more organic findings or may be organic findings by [sic] the pain is greater than what would be expected.

  And in choosing psychogenic pain, you're ruling out malingering. Malingering, you would propose that the pain is faked, that there is conscious controlling over the presentation of pain symptoms or the exacerbation of them.

  In psychogenic pain, the understanding is that while the pain may be related to stress, that's not voluntarily or consciously caused by the patient.

2. Defendant has admittedly paid all of claimant's benefits and medical expenses prior to her initial return to work on 8 October 1984. Apparently defendant also paid temporary total disability from 20 December 1984, the date claimant stopped working for the second time, until 5 February 1985 (discussed further in text regarding temporary total disability). All other allegedly recoverable benefits and medical expenses remain unpaid.

this injury is strictly limited to the amount statutorily established for the "loss of a leg" and is not includable in an award to the "body as a whole." We agree.

In T.C.A. § 50–6–207(3), which provides for awards of permanent partial disability, the legislature has specifically designated rates of recovery for permanent impairment of certain parts of the body, *i.e.* scheduled members. Permanent partial disabilities to areas not specifically enumerated as scheduled members are to be assessed as a percentage of the "body as a whole." T.C.A. § 50–6–207(3)(F). This Court has repeatedly held that an award of permanent partial disability for an injury to a scheduled member is exclusively controlled by the rate established by the legislature for that member and is not includable in an award to "the body as a whole." *Genesco v. Creamer*, 584 S.W.2d 191 (Tenn.1979); *Washington County Bd. of Educ. v. Hartley*, 517 S.W.2d 749 (Tenn. 1974); *Chapman v. Clement Bros., Inc.*, 222 Tenn. 223, 435 S.W.2d 117 (1968); *Shores v. Shores*, 217 Tenn. 96, 395 S.W.2d 388 (1965).

Under T.C.A. § 50–6–207(3)(A)(ii)(0), the leg is a scheduled member. Dr. Johns testified that claimant retains a fifteen percent permanent partial disability in her "left lower extremity as a whole." No attempt has been made to show that the "left lower extremity" extends any farther than the left leg. *Compare Continental Ins. Co. v. Pruitt*, 541 S.W.2d 594 (Tenn. 1976) (injury to "left upper extremity" supported award to body as a whole where proof showed injury to extend beyond arm and into shoulder). The award for claimant's fifteen percent permanent partial disability to her "left lower extremity as a whole" must, therefore, be calculated pursuant to T.C.A. § 50–6–207(3)(A)(ii)(0).

It is apparent that the chancellor believed that claimant retained some degree of permanent partial disability to her body as a whole as a result of her psychogenic pain disorder. This Court has consistently held that mental and nervous illnesses, of which psychogenic pain disorder certainly qualifies, are compensable under the workers' compensation statute when causally connected to a work-related accident. *See Jose v. Equifax*, 556 S.W.2d 82 (Tenn.1977) (and authorities cited therein). No challenge is presented to the chancellor's finding that claimant's psychogenic pain disorder was caused by her work-related accident.

■ In order to sustain an award of permanent disability for a mental illness, however, the permanency of that illness must be established by expert medical testimony. *International Yarn Corp. v. Casson*, 541 S.W.2d 150 (Tenn.1976); *Minton v. Leonard*, 219 Tenn. 642, 412 S.W.2d 886 (1967). In *International Yarn*, the chancellor found that the plaintiff had sustained a thirty-five percent permanent partial disability to the body as a whole as a result of a work-related accident which caused an "hysterical neurosis with conversion reactions of pain in her head, back, legs and other parts of her body and with dissociative reactions of amnesia, inability to talk and irritability and anger." *International Yarn*, 541 S.W.2d at 151. The only expert testimony concerning permanency, that of a psychiatrist, was described by this Court as:

> equivocal and self-contradictory. At one point, he said that Miss Casson could handle "a simple kind of mill job, probably very similar to what she was doing" before the accident. However, he made a similar remark shortly afterward and prefaced it with the comment that "this is pure speculation." But immediately following he said that it was "probable" she could go back to work after this litigation is concluded. He also said that work would have therapeutic value for her.

> He stated that her ability to return to work would depend upon certain hypothetical future events, such as a simple, undemanding job, an understanding supervisor, a protective husband, professional help, a sense of being believed. He questioned her ability to make use of psychiatric help. He replied affirmatively to counsel's suggestion that Miss Casson's complaint "may be with her for the

rest of her life, or they may not be, depending on what the future holds." He also testified that her pain, and especially her irritability and nervousness, would interfere with her ability to work, that this would be a continuing problem, and that he would expect her to be more susceptible to hysterical reaction in the future. But, he also stated that he "couldn't answer" the question whether or not the neurosis would disappear, nor the question whether or not the accident had diminished the appellee's ability to work.

*International Yarn,* 541 S.W.2d at 152.

In holding that there was no material evidence to support the chancellor's award, this Court stated that the psychiatrist's testimony was "so self-contradictory and speculative that it has no probative value upon the issue of the permanency of the [plaintiff's] disability." *Id.*

■ In the present case, claimant relies upon the testimony of Dr. Bronwen Williams, a licensed clinical psychologist and staff member at the Nashville Pain and Stress Clinic,[3] to support the award of permanent partial disability for her psychogenic pain disorder. In response to questioning concerning the prognosis for claimant's return to work. Dr. Williams stated:

A. I think that if she were required to return to work and was put in a position where that was expected of her, she has the ability to do it. I think there was a lot of stress financially and otherwise placed on her that made her doubt her ability, her MMPI.

For instances, I talk about her profile. Her profile was one that we refer to them as feeling over the hill. These people have fears that at this point in their life, they're not going to be able to continue on.

And I think that if she were returned to work and continued with that, that she would have good prognosis; that if she were able to continue to keep out of going to work, that she could return to her state prior to seeing us, convince herself that she was over the hill and her prognosis in that situation would not be very good.

And we did recommend that we're available for an additional, we call it, review of progress, meaning that's our way of getting somebody back in if they're having difficulty and referring them on for further treatment if it looks like she needs someone to spur her on a little bit in her returning to work.

As with *International Yarn,* this testimony does not amount to material evidence to sustain the chancellor's finding that claimant is permanently disabled as a result of her psychogenic pain disorder. Dr. Williams' testimony addresses neither the possibility that claimant's pain will linger indefinitely nor the likelihood that such pain will diminish her ability to function as she did prior to her work-related injuries. Indeed, Dr. Williams' testimony indicates that the relative success of claimant's return to the work force is solely dependent on her own attitude and approach to stresses common to persons her age.

Although in *International Yarn* this Court remanded for a new trial on the issue of the permanency of claimant's neurosis, we do not believe that such procedure would presently serve a productive purpose. Claimant is therefore entitled to permanent partial disability only for fifteen percent of the "loss of a leg" under T.C.A. § 50-6-207(3)(A)(ii)(0).

■ Defendant's second assignment pertains to whether the cost of claimant's participation in the chronic pain program at the Nashville Pain and Stress Clinic is a recoverable medical expense. Defendant argues that such psychological care is outside the scope of "medical" expenses that an employer is required to provide under T.C.A. § 50-6-204(a)(1).[4] We do not agree with this contention.

---

**3.** No challenge has been raised to the competency of a psychologist to render an expert "medical" opinion under *International Yarn* and *Min-* *ton v. Leonard,* and we do not presently address that issue.

**4.** 50-6-204. Medical attendance and hospitalization—Reports—Physical examinations.—

Claimant's orthopedic surgeon, Dr. Johns, testified that she was referred to the Stress Clinic for psychological evaluation concerning her continued complaints of pain despite any apparent organic basis for such pain. Following this initial evaluation, claimant was diagnosed as suffering from psychogenic pain disorder with underlying depression, and the Clinic's chronic pain program was recommended as treatment. Dr. Johns stated that "[w]e followed [the Clinic's] recommendations with regard to the low back program and a chronic pain program as an adjunct to conservative treatment."

As noted in *Wilhelm v. Kerns, Inc., supra,* "the fact that a course of treatment is recommended by a physician does not, *ipso facto,* render the employer liable to provide such treatment...." *See Martinez v. Meharry Medical College, supra.* In *Wilhelm,* this Court considered, *inter alia,* whether an individual suffering from a work related schizophrenic condition could recover the expenses for his "half-way house" care.

The plaintiff's psychiatrist testified as follows:

[the plaintiff] ... faces the rest of his life in a rest home or half-way house care.

Q. Is Mr. Wilhelm's present lodging considered as hospitalization or institutionalization for his psychiatric condition?

A. His half-way environment coupled with his out patient psychopharmacology and psychotherapy is the least restrictive and least expensive type of institutionalization and treatment for his psychiatric condition.

\* \* \* \* \* \*

Q. Please describe in detail what is meant by half-way house concerning any treatment of Mr. Wilhelm, and break down into categories the services provided at a half-way house.

A. His psychological and psychiatric care requires control, guidance and supervision and his lodging, meal selection, nutrition, personal care, personal hygiene and the taking and administering of medications, and the continued supportive assistance in accordance with proper out patient psychotherapy treatment and care. These medical expenses are the psychiatric expenses necessary for the care and treatment and stabilization of Mr. Wilhelm.

In light of this testimony, this Court held that the costs of the "half-way house" care, which was to be provided in the private home of two psychiatric social workers, "should be compensated as a medical or nursing expense." *Wilhelm,* 713 S.W.2d at 69.

Dr. Williams testified that the Stress Clinic "deals primarily with patients referred by medical doctors who are coping with chronic pain and also people who have had more recent injuries." After conducting standardized psychological interviews and tests, the Clinic's staff prepares an evaluation report and an initial diagnosis. Patients may then be recommended for the chronic pain program, described as an intensive group program involving physical therapy, psychological intervention, and biofeedback relaxation training.

(a)(1) The employer or his agent shall furnish free of charge to the employee such medical and surgical treatment, medicine, medical and surgical supplies, crutches, artificial members, and other apparatus, including prescription eyeglasses and eye wear, such nursing services as ordered by the attending physician and hospitalization, including such dental work made reasonably necessary by accident as herein defined, as may be reasonably required; provided, however, that within thirty (30) days after examination or treatment of an employee, a physician shall, upon request, furnish to the employer or to the employer's insurer and to the employee or his attorney a complete medical report as to the claimed injury, its effect upon the employee, the medical treatment prescribed, an estimate of the duration of required hospitalization, if any, and an itemized statement of charges for medical services to date.

Defendant does not question the fact that claimant's participation in the chronic pain program was "reasonably required" to treat her psychogenic pain disorder; *see Wilhelm v. Kern's, Inc.,* 713 S.W.2d 67 (Tenn.1986); *Martinez v. Meharry Medical College,* 673 S.W.2d 141 (Tenn.1984); rather, defendant simply contends that the pain program is not "medical" treatment within the purview of § 50–6–204.

Dr. Williams stated that this program "involves four weeks of treatment from 8:30 in the morning to 3:30 in the afternoon, Monday through Thursday." A typical day in the program begins with "back school," in which a physical therapist teaches patients about body mechanics to help them understand the source of their pain as well as to reduce the chance of re-injury. The patients then participate in an individually patterned therapeutic exercise program, followed by a half-hour of relaxation training. The morning schedule is completed in a "stress management" group which is "designed to teach these people how to cope with stress better." After lunch patients once again perform exercises followed by relaxation training. The typical day in the chronic pain program ends in a "pain management" group in which patients are shown "how the pain has affected their life more generally ..." and "how emotional factors can affect them physically and also ways to deal with those emotional things."

This Court often reiterates its duty to construe the workers' compensation act liberally and equitably and in furtherance of the sound public policy that prompted the statute's enactment. *See Crump v. B & P Constr. Co.*, 703 S.W.2d 140 (Tenn.1986); *Commercial Ins. Co. v. Young*, 209 Tenn. 608, 354 S.W.2d 779 (1961); *Parks v. Carmell Co.*, 168 Tenn. 385, 79 S.W.2d 285 (1935). We likewise hold that the cost of claimant's participation in the chronic pain program is a recoverable "medical" treatment under T.C.A. § 50–6–204(a)(1).

The final issue in this case involves the appropriate amount of temporary total disability to which claimant is entitled. The chancellor's award of twenty-three weeks can be separated into three distinct periods: (i) seven weeks from the day that claimant stopped working because of her knee problem, 20 December 1984, until the day of her knee operation, 5 February 1985; (ii) twelve weeks subsequent to her operation; and (iii) four weeks in the chronic pain program. Both parties challenge the chancellor's calculations.

First we agree with defendant that the chancellor erroneously awarded temporary total disability from 20 December 1984 until 5 February 1985. Although claimant's testimony supports a finding that she was totally disabled to work during this period, she apparently has already received temporary total disability benefits for this period. During questioning by claimant's attorney regarding the receipt of benefits, the following exchange took place:

Q. After December 20, 1984, when you saw Dr. Lowery and up until this mid-October of '85, were you off from work at Middle Tennessee Medical Center?

A. Yes, sir, I had been off several times, you know, several occasions because on account of my injury.

Q. I'm asking you now if you were off solid during that period of time?

A. Yes, sir.

Q. Did Worker's Comp pay you the hundred thirty-six a week?

A. After—in February, the day before I had my surgery, they stopped it because I haven't got my pay or compensation since then.

Furthermore, on cross-examination, the following exchange occurred:

Q. They, being Aetna, paid you this one-hundred-thirty-six-dollar check starting after the injury up until the time you came back to work the first time; is that right?

A. Uh-huh. And then when I went back to work—I don't think I went back to work because when they cut my Aetna benefits off, it was the day before I had my surgery in February.

Although defendant offered no proof on this issue, claimant has the burden of establishing a prima facie case of entitlement to temporary total disability. *Simpson v. Satterfield*, 564 S.W.2d 953, 955 (Tenn. 1978). Claimant's testimony indicates that she received temporary total disability until the day of her operation, and thus there is no material evidence to support the chancellor's award for the seven weeks prior to her operation.

Dr. Johns testified that claimant was temporarily totally disabled as a result of her knee operation for twelve weeks subsequent to that operation, and no dispute exists over this portion of the chancellor's award.

 Defendant argues, however, that claimant is not entitled to temporary total benefits for the four weeks that she spent in the chronic pain program. In contrast, claimant maintains that she is not only entitled to these four weeks, but she also claims entitlement to the entire thirty-two weeks from the date of her operation until her enrollment in the chronic pain program. We agree with claimant.

Claimant's testimony established that she did not work from 20 December 1984 until after completing the chronic pain program. Claimant did not undergo psychological evaluation at the Stress Clinic until mid-July 1985, well after the normal recuperative period for her knee operation. Claimant testified that Dr. Johns referred her to the stress clinic because "I kept going to [Dr. Johns] almost every other day or every week for pain and stuff because I was hurting so bad." Regarding her physical condition prior to participation in the pain program, claimant stated "[i]t was just hurting and constantly hurting and just like nerves twisting up like in my back and stuff and nerves into my hips and stuff, which its still like that, but I've learned to cope with it better about going through the pain and stress clinic." Furthermore, Dr. Williams testified that claimant was ready to return to work upon completion of the pain program.

We believe that claimant established a prima facie case that she was totally disabled to work from 20 December 1984 until her completion of the chronic pain program. *See Simpson v. Satterfield, supra; Anderson v. Dean Truck Line, Inc.*, 682 S.W.2d 900, 903 (Tenn.1984). Defendant has offered no proof that claimant was able to work at any time prior to completion of the pain program. Therefore, claimant is entitled to temporary total disability for the entire period from her knee operation until

her completion of the chronic pain program.

This cause is remanded with instructions to award permanent partial disability for fifteen percent of the loss of a leg and to recalculate temporary total disability from the date of claimant's operation until the completion of the pain program.

Reversed in part and remanded; costs equally divided between the parties.

HARBISON, C.J., and COOPER, BROCK and DROWOTA, JJ., concur.